ACCEPTED
13-15-00099-CV
THIRTEENTH COURT OF APPEALS
CORPUS CHRISTI, TEXAS
7/21/2015 10:10:42 AM
CECILE FOY GSANGER
CLERK

FILED IN
13th COURT OF APPEALS
CORPUS CHRISTI/EDINBURG, TEXAS
7/21/2015 10:10:42 AM
CECILE FOY GSANGER
Clerk

Cause No. 13-15-00099-CV

IN THE COURT OF APPEALS
FOR THE THIRTEENTH SUPREME JUDICIAL DISTRICT
CORPUS CHRISTI, TEXAS

_____

IN THE INTEREST OF

L.D.J. III, A.Y.J., W.F.J. and C.J.,

CHILDREN

_____

Appealed from the 206th Judicial District Court of
Hidalgo County, Texas
Hon. Rose Guerra Reyna, Presiding

_____

APPELLANT'S BRIEF ON THE MERITS
_____

ORAL ARGUMENT REQUESTED

# IDENTITY OF THE PARTIES

**PETITIONER/APPELLANT:**
Blanca E. Jones

**COUNSEL:**
Francisco Guerrero, II
SBN 24047588
PENA GARCIA GUERRERO PLLC
900 Kerria Avenue
McAllen, TX 78501
t: 956.948.2221
f: 888.422.6821
fg@pgglex.com

**Counter-Petitioner/APPELLEE:**
Helen M. Jones

**COUNSEL:**
Roel "Robie" Flores
The Firm of Roel "Robie" Flores
3331 N. Ware Rd
Mc Allen, Texas 78501
t: 956.631.7188
f: 956.631.7268
robiefloreslaw@att.net

**TABLE OF CONTENTS**

IDENTITY OF THE PARTIES…………………………………..……. 2

TABLE OF CONTENTS…………………………………… ……..… 3

TABLE OF AUTHORITIES…………………………………….…... 4

RECORD REFERENCES…………………………………….….. 5

STATEMENT OF THE CASE……………………………………... 6

STATEMENT REGARDING ORAL ARGUMENT ………………….. 7

ISSUES PRESENTED…………………………………………….. 8

STATEMENT OF FACTS………………………….................... 9

SUMMARY OF THE ARGUMENT……………………………...… 13

ARGUMENT…………………………………………………….. 16

PRAYER……………………………………………….…. 39

APPENDIX………………………………………………….… 41

# TABLE OF AUTHORITIES

## STATE CASES

*Brigham v. Brigham*,

863 S.W.2d 761 (Tex.App.- Dallas, 1993)…………………………… 35

*Chavez v. Chavez*,
148 S.W. 3d 449 (Tex.App.-El Paso, no pet.)……………………… 31, 34

*Critz v. Critz*,
297 S.W.3d 464 (Tex.App.—Fort Worth 2009, no pet.)…. 17, 18, 24, 25, 29, 34

*Danet v. Bhan,*
436 S.W.3d 793 (Tex. 2014)………………………..……………….. 34

*Gray v. Shook,*
329 S.W.3d 186 (Tex.App.-Corpus Christi 2010)…………… 30, 31, 36, 37, 38

*In re S.A.H,*
420 S.W.3d 911 (Tex.App.-Houston [14th] Dist., 2014)………….. 19, 22, 26

*In re S.M.D,*
329 S.W.3d 8 (Tex.App.-San Antonio, 2010)(reh'g overruled, rev. dism'd)…34

*Lewelling v. Lewelling*,
796 S.W.2d 164 (Tex.1990)…………………………………….. 29, 35, 37

*May v. May*,
829 S.W.2d 373 (Tex.App.-Corpus Christi 1992, writ denied)……. 30, 36, 37

*Shook v. Gray*,
381 S.W.3d 540 (Tex. 2012) ……………………………………… 36, 37

## STATE STATUTES

TEX. FAM. CODE ANN. §153.002…………………………………….. 36
TEX. FAM. CODE ANN. §153.131…………………………………...23, 28, 34, 37
TEX. FAM. CODE ANN. §153.373………………………………….18, 19, 27

# RECORD REFERENCES

CR_        Clerk's Record

1 RR_      Volume one of Recorder's Record

2 RR_      Volume two of Recorder's Record

3 RR_      Volume three of Recorder's Record

Ex. P-_    Petitioner/Appellant's exhibit to the Recorder's Record

Ex. CP-_   Counter-Petitioner/Appellee's exhibit to the Recorder's Record

**STATEMENT OF THE CASE**

This appeal is taken from a final order rendered in the 206th Judicial District Court of Hidalgo County in an action filed as a Suit Affecting Parent Child Relationship. (CR p.110). The final order in this matter was rendered after a bench trial held on December 17th and 18th, 2014. The Court signed Findings of Fact and Conclusions of Law on January 28, 2015. (CR p.108). Appellant filed her Notice of Appeal on February 17, 2015. (CR p.132).

# STATEMENT REGARDING ORAL ARGUMENT

This case involves the conservatorship of four children. The trial court appointed paternal grandmother as sole managing conservator of these children, instead of their biological mother.

The mother of these children challenges, in this appeal, that the trial court abused its discretion because the evidence is legally and factually insufficient to support the trial court's judgment as to rebuttal of the statutory presumptions in Tex. Fam. Code §§151.131 and 151.373. Appellee failed to prove that Appellant had 1.) voluntarily relinquished actual care, control and possession of the children to Appellee for a period of one year or more; and/or 2.) that it would not be in the children's best interest to have their mother appointed sole managing conservator because such appointment would significantly impair their physical health and emotional development.

Since neither the Family Code nor case law provide bright-line definitions of the term "voluntarily relinquishment" or the term "significant impairment", resolution of cases such as these is fact intensive analysis. Due to the Appellant's challenge of the legal and factual sufficiency of the evidence in this matter, oral argument would be most beneficial for a clear presentation of the facts and to the court's understanding of the facts in this case.

## ISSUES PRESENTED FOR REVIEW

The trial court abused its discretion in appointing Appellee as the sole managing conservator of the children and Appellant the possessory conservator.

I.      The evidence is legally and factually insufficient to support the court's Finding of Fact No. 2.

III.    The evidence is legally and factually insufficient to support the court's Finding of Fact No. 4.

III.    The evidence is legally and factually insufficient to support the court's Finding of Fact No. 5 that Appellee rebutted the statutory parental presumption in Tex. Fam. Code §153.131.

IV.     The evidence is legally and factually insufficient to support the court's Finding of Fact No. 5 that Appellee rebutted the statutory parental presumption in Tex. Fam. Code§153.373.

V.      The court erred in its Conclusion of Law – Conservatorship because the evidence is legally and factually insufficient to support the conclusion that Appellee be appointed sole managing conservator of the children and Appellee should be appointed possessory conservator.

## STATEMENT OF FACTS

a.     Appellant was married to Appellee's son, Larry Dean Jones, Jr.(hereinafter "Dean" or "Appellant's husband"), on April 29, 2011. Prior to their marriage, three children were born to Appellant and Dean. (2RR p.102, line 19-23). The children lived with Appellant prior to her marriage to Dean. (2RR pp.94-102). On or about December 2012, Appellant left the United States for Mexico to complete the immigration process which she and her husband had initiated. (CR p.15; 2RR p.111; Ex. P-4).

b.     On or about January 2013, Appellant was denied re-entry into the United States and had to remain in Mexico pending a new visa appointment, because the proper documentation regarding her pregnancy with the child C.J. had not been submitted. (CR p.15; 2RR p.111; Ex. P-4). The youngest child, C.J., was born while Appellant resided in Mexico awaiting a subsequent visa appointment. (2RR p.119). Meanwhile, her husband remained in the United States managing their affairs in her absence. (2RR pp.38-39 and 46; Ex. P-4).

c.     On or about December 21, 2012, Appellee took possession of three of the children the subject of this suit. (3RR p.35). Appellee had possession of the children for the time period that Appellant was to be outside the United States awaiting subsequent visa interview for her and C.J.. (2RR p.104, line 7-25 and

9

3RR p.37, line 9-25). On or about March 2014, Appellant lawfully re-entered the United States with her youngest child, C.J. (2RR p.119; Ex. P-3).

d.      Immediately upon her return, Appellant and Dean made plans to retrieve their children from Fredericksburg, Texas where the children were living with Appellee. (2RR p.119;).  On or about April 2014, Appellant and Dean traveled to Fredericksburg, Texas to reunite the family and return with the children to McAllen, Texas. (2RR p.p. 120-121). Appellant, Dean, and Appellee subsequently entered into an agreement to allow the children L.D.J. III and W.F.J. to spend time with their grandmother, Appellee, until the end of the school year. (2RR p.p. 121) The agreement called for the children to return to McAllen, Texas so they could live with Appellant, her husband, and the other children A.Y.J and C.J permanently. (2RR p.121).

e.      On or about June 2014, Dean disappeared for approximately two weeks while on an alleged business trip. (2RR pp.122- 124). During Dean's two-week absence, Appellant attempted to regain possession of her children, but Appellee refused to return the children to Appellant, in breach of their agreement. (2RR p.126; 3RR p.p. 93-94; Ex. CP-1). Subsequently, Appellant filed for divorce in Hidalgo County, Texas. (2RR p.125). In response to Appellant's divorce action, Dean filed a divorce action in Kendall County in Cause No. 14-283-CCL, styled In the Matter of the Marriage of Larry D. Jones, Jr. and Blanca Estella Jones and In

the Interest of L.D.J, III, A.Y.J, W.F.J. and C.J., Minor Children (herein "Dean's divorce action"). (3RR p.p. 95-101; Ex. P-5). The Appellee intervened in Dean's divorce action. (3RR p.p. 95-101; Ex. P-5)

f. Appellant and Dean began to reconcile their marriage in the latter part of June 2014. (2RR p. 134; Ex. P-8). Appellant and Dean eventually travelled to Fredericksburg, Texas to regain possession of the two remaining children, L.D.J, III and W. F. J., in an attempt to work on their marriage. (2RR p. 134). On July 3, 2014, Dean's father drove Appellant with all her four children down to McAllen, Texas. (2RR p. 135).

g. On or about July 3, 2014, Appellant's husband committed suicide in Fredericksburg, Texas. (2RR p. 134, line 16-19). On July 11, 2014 Appellee sought and obtained a Writ of Attachment for all four children from the Kendall County Court at Law pursuant to her intervention in Dean's divorce action. (3RR p.p. 95-101; Ex. P-5). On or about July 11, 2014, Appellee travelled from Kendall County to McAllen, Texas and had the Writ of Attachment for all the children executed by Hidalgo County Sheriff's officers. (3RR p. 100, line 21-25 and p. 102).

h. On July 16, 2015, Appellant filed the instant Suit Affecting Parent Child Relationship, in Hidalgo County, Texas. (CR p.15). On July 25, 2014, the Kendall County Court at Law dismissed all of Appellee's and Dean's actions pending

11

before it for lack of jurisdiction due to Dean's death on July 3, 2014. (Ex. P-5). Appellee, subsequently, filed a counter-petition in the instant Suit Affecting Parent Child Relationship. (CR p. 36).

i. On December 17th and 18th, 2014 a bench trial was held on the parties' Suits Affecting Parent Child Relationship. The issues before the court were:

(1) whether appointment of Appellant, the natural parent of the children, as sole managing conservator of the children would not be in the best interest of the children because the appointment would significantly impair the children's physical health or emotional development; and

(2) whether Appellant voluntarily relinquished actual care, control and possession of the children to Appellee, a nonparent, for a period of one year or more; of which time period was not more than 90 days prior to Appellee filing suit in the instant case.

The final judgment of the trial court appointed Appellee as the sole managing conservator of all children made the subject of this Suit Affecting Parent Child Relationship, and Appellant was appointed possessory conservator of her biological children. (CR p.110)

j. The trial court signed findings of fact and conclusions of law on January 12, 2015. (CR p.108). Appellant appeals from this final judgment. (CR p.110 and 132).

## SUMMARY OF THE ARGUMENT

The Appellee, a non-parent, challenged the Appellant's, right to be appointed sole managing conservator of the children. To succeed in her challenge, the Appellee had to rebut the presumption that the best interest of the children would be best served by appointing Appellant, the natural parent, as managing conservator. This placed a heavy burden on the Appellee, as this parental presumption is deeply embedded in Texas law. This parental presumption is codified in Sections 153.131 and 153.373 of the Texas Family Code.

The Appellant's first argument is that in order for Appellee to rebut the parental presumption in set out in Tex. Fam. Code §153.373, the Appellee had the burden of proving, by a preponderance of the evidence, that 1) the Appellant had voluntarily relinquished actual care, control, and possession of the children to the Appellee for a period of one year or more; and 2) that the appointment of the Appellee as conservator of the children is in the best interest of the children. When Appellant went to Mexico for processing her visa to obtain residency in the United States, she left the children with her husband, Dean, not with the Appellee. During her involuntary stay in Mexico, the Appellant maintained telephone contact with the children through her husband, but had little, if any, contact with Appellee. Further, Appellee testified that she obtained possession of the children from her son, Appellant's husband, not from Appellant. Additionally, Appellee further

testified that she had no evidence that Appellant had voluntarily relinquished the children to her.

Appellee failed to show, by a preponderance of the evidence, that appointment of the Appellee as sole managing conservator of the children on voluntary relinquishment grounds would be in the children's best interest. Thus, the evidence is legally insufficient to support the trial court's judgment awarding conservatorship to Appellee on voluntary relinquishment grounds. Alternatively, and without waiving the legal sufficiency challenge, the evidence is factually insufficient to show that Appellee voluntarily relinquished care, control and possession of the children for one year or more and appointment of the Appellee as sole managing conservator of the children would be in the children's best interest.

The court abused its discretion in appointing Appellee as the sole managing conservator of the children, and the court's judgment should be reversed and judgment rendered that Appellee be appointed the sole managing conservator of the children. Alternatively, should the court find the evidence factually insufficient, the trial court's judgment should be reversed and the case remanded to the trial court for a new trial and further fact-finding.

The Appellant's second argument is that in order for the Appellee to rebut the parental presumption set out in Tex. Fam. Code §153.131, the Appellee had the burden of showing, by a preponderance of the evidence, that appointment of the

Appellant as sole managing conservator of the children would not be in the children's best interest because the appointment would significantly impair the children's physical health or emotional development. At trial, the Appellant offered little more than her contentions that she would be a better custodian of the children or that she has a strong and on-going relationship with the children.

To discharge her burden of rebutting this parental presumption to prevent Appellee from being appointed sole managing conservator of the children, the Appellee was required to offer evidence of specific actions or omissions of the Appellant that demonstrate that appointing Appellant as conservator would result in physical or emotional harm to the children. Neither the Appellee nor the witnesses she called to testify offered any evidence that Appellant was presently engaged in some detrimental immoral or criminal conduct of the type that this and other Texas courts have found to pose a real, rather than a speculative, harm to a child's physical health or emotional development, e.g. illegal drug use, alcohol abuse, family violence against her spouse or the children, drug dealing, neglect of a child or other criminal activity.

Appellee failed to show by a preponderance of the evidence that appointment of the Appellant as sole managing conservator of the children would not be in the children's best interest because the appointment would significantly impair the children's physical health or emotional development. Thus, the evidence

is legally insufficient to support the trial court's judgment awarding conservatorship to Appellee on impairment grounds. Alternatively, and without waiving the legally sufficiency challenge, the evidence is factually insufficient to show that appointment of the Appellant as sole managing conservator of the children would not be in the children's best interest because the appointment would significantly impair the children's physical health or emotional development.

Therefore, the evidence is legally and factually insufficient to support the trial court's Finding of Fact Nos. 2, 4 and 5, and the court abused its discretion in appointing Appellee as sole managing conservator of the children on voluntary relinquishment grounds.

## ARGUMENT

The following issues and sub-issues are joined in this part of the argument because they are related to the trial court's finding of facts that Appellee rebutted the statutory parental presumption in Tex. Fam. Code §153.373.

**Issue No. 1.** **The trial court abused its discretion in appointing Appellee as the sole managing conservator and Appellant possessory conservator of the children.**

**Issue No. 2.** **The evidence is legally and factually insufficient to support the court's Finding of Fact No. 2.**

**Issue No. 3.**   The evidence is legally and factually insufficient to support the court's Finding of Fact No. 4.

**Issue No. 4.**   The evidence is legally and factually insufficient to support the court's finding of fact No. 5 that the Appellee had rebutted the statutory parental presumption in Tex. Fam. Code §153.373.

**Issue No. 5.**   The court erred in its Conclusion of Law – Conservatorship because the evidence is legally and factually insufficient to support the conclusion that Appellee be appointed sole managing conservator of the children and Appellee should be appointed possessory conservator.

### Arguments & Authorities

A.   Standard of Review

A trial court's decision regarding the conservatorship of a child is reviewed under an abuse of discretion standard. Critz v. Critz, 297 S.W.3d 464, 469 (Tex. App.--Fort Worth, 2009). In an abuse of discretion review, legal and factual insufficiency are not independent grounds for asserting error, but are merely relevant factors in assessing whether a trial court abused its discretion. Id. at 473. In applying the abuse of discretion standard, an appellate court in a family law case must apply a two-prong analysis: (1) whether the trial court had sufficient evidence

upon which to exercise its discretion; and (2) whether the trial court erred in applying its discretion. Id.

B.      Voluntary Relinquishment of the Children for One Year or More.

In order for Appellee to rebut the parental presumption set out in TEX. FAM. CODE §153.373[1], the Appellee had the burden of showing, by a preponderance of the evidence, that 1) the Appellant had voluntarily relinquished actual care, control, and possession of the children to the Appellee for a period of one year or more; and 2) that the appointment of the Appellee as conservator of the children is in the best interest of the children. Critz v. Critz, 297 S.W.3d 464, 470 (Tex. App.--Fort Worth, 2009).

The trial court found that Appellant had voluntarily relinquished the actual care, control and possession of the children to the Appellee for a period of six months or more. (CR pp. 108, Finding of Fact Nos. 2). The evidence is legally and factually insufficient to support the trial court's finding of fact that Appellee rebutted the parental presumption in TEX. FAM. CODE §153.373 on grounds that Appellant had voluntarily relinquished the actual care, control and possession of

---

[1] Sec. 153.373. VOLUNTARY SURRENDER OF POSSESSION REBUTS PARENTAL PRESUMPTION. The presumption that a parent should be appointed or retained as managing conservator of the child is rebutted if the court finds that:
(1) the parent has voluntarily relinquished actual care, control, and possession of the child to a nonparent, licensed child-placing agency, or authorized agency for a period of one year or more, a portion of which was within 90 days preceding the date of intervention in or filing of the suit; and
(2) the appointment of the nonparent or agency as managing conservator is in the best interest of the child.

18

the children to the Appellee for a year or more. See (CR pp. 108-109, Finding of Fact Nos. 2, 4, 5). Although, the evidence shows that the children were in Appellee's possession, the Appellant contends that such possession was not the result of her having voluntarily relinquished the actual care, control and possession of her children to the Appellee.

### *What is Voluntary Relinquishment*?

The Family Code does not define "voluntarily relinquish" as that term is used in section 153.373. However, at least one court has recently construed "voluntary relinquishment" as meaning "to give up by one's own free will." See In re S.A.H., 420 S.W.3d 911, 922 (Tex. App. --Houston [14th] Dist., 2014). To prove voluntary relinquishment, Appellee carries the burden of proving that Appellant placed L.D.J. III, A.Y.J., W.F.J. and C.J. into Appellee's care and possession during on or after December 2012 of her own free will "without any legal obligation or other external compulsion to do so." In re S.A.H., 420 S.W.3d 911, 923 (Tex. App. –Houston [14th] Dist., 2014).

### *Evidence of Voluntary Relinquishment Offered at Trial*:

At trial, Appellee sought to prove that Appellant had relinquished actual care, control and possession of her biological children, L.D.J, III, A.Y.J, and

W.F.J, on December 21, 2012. Appellee avers in her sworn petition that Appellant had "voluntarily relinquished" the children to her on December 21, 2012. (CR p.36). Yet, at trial, Appellee testified that it was, actually, her son, Dean (Appellant's husband) who had delivered possession of L.D.J, III, A.Y.J, and W.F.J to her on December 21, 2012 (3RR pp. 35-37).

Appellee testified that she was doing what her son wished her to do. (3RR pp. 34-37) In connection with this testimony, Appellee referred to her son's will and a power of attorney that he had executed as his wishes for her to remain the conservator of his children after his death. (3RR pp. 35-37; Ex. P-7; Ex. CP-7). Yet, these instruments are only evidence that Appellant's husband  - the person to whom Appellant had entrusted her children[2] and the person from whom Appellee received possession of the children[3] – was still exercising control and care of the children by planning for their future.  Dean's will and power of attorney were not an immediate granting of rights to the children to Appellee, as Appellee contended at trial, but rather a conditional grant of rights in the future.

Appellant entrusted the care, control, and possession of the children to her husband when she departed to Mexico, and she also sought to exercise some care

---

[2] (2RR p. 38, line 12-25, p. 39-44, and p.46, line 5-19).

[3] (3RR pp. 35-37).

20

and control of children, while she was involuntarily outside the United States, by requesting that Dean bring the children to visit her in Mexico. (2RR p.28, line 18-23, p.32, line 19, p.37, line 23-25, pp. 39-44, p.46). Appellant's requests to have her children travel into Mexico to visit her were denied by her husband because he feared for the children's safety. (2RR pp.117, line 5-25 and 118, line 1-11). Appellant's husband controlled the line of communication between Appellant and the children, and he exercised control over the children in Appellant's absence. (2RR p. 32, line 19). The Appellant communicated with the children via telephone, in two ways: 1) Dean would call her from Fredericksburg and put the children on the phone to talk the Appellant ; and 2) when Dean visited her in Mexico, he would call the Appellee and ask that the children be put on the phone so they could talk with Appellant. (2RR pp.39-44). This is further evidence of the control that Dean maintained over their children while Appellant was unable to lawfully enter the United States. (2RR p. 92, line 1-22, pp. 107-109; 3RR pp. 36-37; Ex. P-4, page 15). It is also evidence that Appellant was exercising parental care and control over the children. This also begs a very pivotal question: if in fact, Appellant had voluntarily relinquished the care, control, and possession of the children to Appellee, wouldn't she have been contacting Appellee, rather than Dean, to have the children visit her in Mexico?

The will and power of attorney executed by Appellant's husband, without Appellant's knowledge and consent, were the memorialization of the control over their children he maintained throughout the time Appellant was outside the United States. These documents prove how he maintained control over their children's future, if upon leaving the United States he was not to return during this immigration process due to an occurrence outside his control. (3RR pp. 36-37)

On cross-examination, Appellee testified that she had no direct evidence that proved Appellant had voluntarily relinquished the children to her other than her assumption that the preparation of the children's bags by Appellant for their departure with Appellee in December 2012 was evidence of Appellant's intent to voluntarily relinquish actual care, control and possession of the children to her. (3RR pp. 77-79). Appellee admits that the possession she enjoyed during the time Appellant was to be outside the country was temporary pending Appellant's return to the United States. (3RR p. 37, line 9-25). There is no evidence of any agreement between Appellant and Appellee, either oral or written, whereby Appellee relinquished voluntary care, control, and possession of the children to Appellee[4]. See, e.g., In re S.A.H., 420 S.W.3d 911, 914 and 924 (2014) (mother's granting of

_____

[4] Even assuming, arguendo, that any agreement made by Dean with Appellee could be imputed to Appellant, the evidence militates against even Dean having voluntarily relinquished care, control, and possession of the children to Appellee, as the evidence reveals an indicia of parenting on his part with respect to the children.

power of attorney over child to great aunt evidenced voluntary relinquishment). The evidence shows that Appellant and Appellee had little to no communication with one another before and after Appellant left the United States. (2RR pp. 39-44, p.46, line 5-19, p.102, line 13-18, p.118, line 1-25; 3RR pp. 84-87). The only evidence in the record that can be directly attributed to Appellant having agreed to Appellee having possession of the children is when Appellee "begged" for the children to stay with her after Appellant and Dean travelled to Fredericksburg in April of 2014 to retrieve the children. (3RR p. 45, line 11-25), and Appellant and Dean agreed to the children staying with Appellee until the end of the school year. (2RR p.p. 121).

### *No Evidence of Voluntary Relinquishment*

Thus, while Appellant may have been physically apart from L.D.J. III, W.F.J., and A.Y.J. for all of 2014, there is no evidence that she gave up, by her own free will, the care, custody, and possession of the children to the Appellee. In particular, there is no evidence that Appellee ever had possession of C.J., prior to this suit being filed. She did not obtain possession of C.J. until she obtained such possession through the Writ of Attachment issued by the Kendall County Court. See TEX. FAM. CODE §153.131.

Assuming, arguendo, that Appellant had made some agreement with Appellee to have Appellee care for the children while Appellant went to Mexico to

23

take care of her visa matter, this case would be analogous to Critz v. Critz, 297 S.W.3d 464 (Tex.App.-Fort Worth 2009, no pet.). In Critz v. Critz, the grandparents of a child were awarded joint managing conservatorship of a child that they alleged had been voluntarily relinquished to them by the biological mother of the child for one year or more. Critz v. Critz, 297 S.W.3d 464 (Tex.App.-Fort Worth 2009, no pet.). The Critz Court determined that even in light of some evidence of separation from the child on the part of the mother for over a period of one year, there still lacked the relinquishment of control of the child given her periodic contact with him. Critz, 297 S.W.3d at 474.

In the instant case, Appellant was involuntarily prevented from returning to the United States which caused her to be away from the children that she had left in her husband's care. (2RR p.28, line 18-23, p.32, line 19, p.37, line 23-25, pp. 39-44, p.46). Yet, she periodically spoke with her children and discussed their well-being with her husband, the children's parent with access to them while she resided in Mexico. (2RR pp.39-44). Appellant's husband limited her access to the children further by denying her requests to have her children brought to her while she resided outside the United States. (2RR pp. 39-44, p.46, line 5-19, p.102, line 13-18, p.118, line 1-25; 3RR pp. 84-87). Additionally, Appellant requested her children be returned to her in April 2014 when she and her husband travelled to

Fredericksburg, Texas to retrieve the children from Appellee; which was acknowledged by Appellee. (2RR pp.120-121; 3RR p. 45, line 11-25).

As in Critz, the evidence of voluntary relinquishment of the children is not present in this case. Appellant maintained as much contact with her children as she had been accustomed to given the great efforts her husband undertook in caring for their children in her absence, and the impossibility of her physical presence within the United States given the fragile nature of her immigration status. (2RR p.28, line 18-23, p.32, line 19, p.37, line 23-25, pp. 39-44, p.46). In Critz, the Court found sufficient contact with the child by the mother and that she had requested return of her child. Critz v. Critz, 297 S.W.3d at 474 & n.39 (voluntary relinquishment ended when mother filed answer to conservatorship petition). Assuming, arguendo, that Appellant had delivered possession of the children to Appellee rather than to her husband, Dean, when she left for Mexico, such act could not be deemed an act of free will. Appellant's inability to physically take possession of her children and care for them as she had done prior to her departure was not a completely voluntary decision by her but rather a product of an external compulsion, i.e., having to leave to take care of her visa matter. This should be considered when determining whether Appellee's physical possession of the children was truly an act of voluntary relinquishment by Appellant of her children. (2RR p.28, line 18-23, p.32, line 19, p.37, line 23-25, pp. 39-44, p.46; Ex. P-). See In re S.A.H., 420

25

S.W.3d 911, 922 (Tex. App. --Houston [14th ] Dist., 2014)(relinquishment must be an act of free will done without any legal obligation or other external compulsion to do so). To require Appellant to have unlawfully entered the United States to visit and care for the children in order to be able to defeat Appellee's conservatorship action would be unreasonable because for her to do so would jeopardize her ability to lawfully reside within the United States in accordance with federal law. This would assure that Appellee could now use this unlawful act against the Appellant to rebut the parental presumption in Tex. Fam. Code §153.131.

Further, there is no evidence that Appellee ever had possession of the youngest child, C.J., at any time prior to July 11, 2014 when she sought and obtained a Writ of Attachment for all four children from a Kendall County court. (3RR pp. 95-101; Ex. P-5). Nor did Appellee proffer any evidence that she had filed any action to assert her rights to the children prior to Appellant and her husband travelling to Fredericksburg, Texas to pick up their children. Additionally, there was no evidence proffered by Appellee that she had any relationship with the child, C.J., after she was born in Mexico. In fact, Appellee provided no evidence that she sent gifts, cards, care packages or the like to her new granddaughter outside the United States. There was no evidence she ever inquired as to the health or well-being of this child. The record is devoid of any evidence that she had the possibility to assert any claim of conservatorship to this child, due to fact that she

did not possess the child the requisite time period prior to the institution of the instant cause. (CR p. 59)  See Tex. Fam. Code §153. 373.

Appellee failed to show by a preponderance of the evidence that appointment of the Appellant as sole managing conservator of the children on this relinquishment ground would be in the children's best interest, thus the evidence is legally insufficient to support the trial court's Finding of Fact Nos. 2, 4, and 5 (CR, pp. 108-109). Alternatively, the evidence is factually insufficient, as the great weight of the evidence is against any voluntary action or omission on Appellant's part in voluntarily relinquishing actual care, control and possession to any other person aside from her husband. (2RR p.28, line 18-23, p.30, line 22-24, p. 31, line 8-10, p.32 line 19, p.38, line 12-25 and p.46, line 5-19).

The trial court abused its discretion in appointing Appellee as sole managing conservator of the children on grounds of voluntary relinquishment because the evidence is legally and factually insufficient to establish that Appellant had voluntarily relinquished the care, control, and possession of the children to Appellee.

Therefore, the court abused its discretion in appointing Appellee as the sole managing conservator of the children, and the court's judgment should be reversed and judgment rendered that Appellee be appointed the sole managing conservator of the children. Alternatively, should the court find the evidence factually

insufficient, the trial court's judgment should be reversed and the case remanded to the trial court for a new trial and further fact-finding.

## ARGUMENT (cont'd)

The following issues and sub-issues are joined in this part of the argument because they are related to the trial court's finding of facts that Appellee rebutted the statutory parental presumption in TEX. FAM. CODE §153.131.

**Issue No. 6.** **The trial court abused its discretion in appointing Appellee as the sole managing conservator and Appellant possessory conservator of the children.**

**Issue No. 7.** **The evidence is legally and factually insufficient to support the court's Finding of Fact No. 2.**

**Issue No. 8.** **The evidence is legally and factually insufficient to support the court's Finding of Fact No. 4.**

**Issue No. 9.** **The evidence is legally and factually insufficient to support the court's finding of fact No. 5 that Appellee rebutted the statutory parental presumption in Tex. Fam. Code §153.131.**

**Issue No. 10.** **The court erred in its Conclusion of Law – Conservatorship because the evidence is legally and factually insufficient to support the conclusion that Appellee be appointed sole managing conservator of the children and Appellee should be appointed possessory conservator.**

**Arguments & Authorities**

A.      Standard of Review

A trial court trial court's decision regarding the conservatorship of a child is reviewed under an abuse of discretion standard. Critz v. Critz, 297 S.W.3d 464, 469 (Tex. App.--Fort Worth, 2009). In an abuse of discretion review, legal and factual insufficiency are not independent grounds for asserting error, but are merely relevant factors in assessing whether a trial court abused its discretion. Id. at 473. In applying the abuse of discretion standard, an appellate court in a family law case must apply a two-prong analysis: (1) whether the trial court had sufficient evidence upon which to exercise its discretion; and (2) whether the trial court erred in applying its discretion. Id.

B.      Impairment of Children's Physical Health or Emotional Development

"The presumption that the best interest of a child is served by awarding custody to a natural parent is deeply embedded in Texas law." Lewelling v. Lewelling, 796 S.W.2d 164, 166 (Tex.1990). Therefore, section 153.131[5] of the

---

[5]     Sec. 153.131.  PRESUMPTION THAT PARENT TO BE APPOINTED MANAGING CONSERVATOR.
(a)  Subject to the prohibition in Section 153.004, unless the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development, a parent shall be appointed sole managing conservator or both parents shall be appointed as joint managing conservators of the child.

(b)  It is a rebuttable presumption that the appointment of the parents of a child as joint managing conservators is in the best interest of the child.  A finding of a history of family violence involving the parents of a child removes the presumption under this subsection.

29

Texas Family Code requires that the parent be appointed sole managing conservator or both parents be appointed joint managing conservators unless the nonparent proves by a preponderance of the credible evidence that "appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development...." Tex. Fam.Code Ann. § 153.131 (Vernon 2008); Gray v. Shook, 329 S.W.3d 186, 196 (Tex.App.-Corpus Christi 2010). The Family Code's presumption in favor of parental custody places a "heavy burden on a nonparent seeking custody." May v. May, 829 S.W.2d 373, 376 (Tex.App.-Corpus Christi 1992, writ denied). To rebut the presumption, "the evidence must support a logical inference that some specific, identifiable behavior or conduct of the parent will probably cause significant physical or emotional harm to the child." Id. at 377. Any "close call" must be resolved in favor of the parent over the nonparent. Gray v. Shook, 329 S.W.3d at 196 (citing Chavez v. Chavez, 148 S.W.3d 449, 459 (Tex.App.-El Paso 2004, no pet.)).

### ***Evidence of Impairment of Children's Physical Health or Emotional Development Offered at Trial:***

In addition to her testimony, Appellee called two witnesses in an attempt to prove that Appellant was an unfit parent. The first witness that Appellee called to

testify about the Appellant was Evelia Salinas. Ms. Salinas' testified about events that had occurred about 3 or 4 years prior to the trial date, and had little to no bearing on Appellant's ability to care for her children. (2RR p. 153, line 6-10). Ms. Salinas' testimony can be summarized, as follows: 1) that she had been around Appellant and her children approximately four or five times in the year 2011. (2RR p. 153, line 6-10); 2) that she believed her brother in law acted inappropriately with Appellant at a party; and 3) that she believed Appellant was a devil worshipper because of some ring that Appellant was wearing symbolizing a cult religion commonly referred to as "La Santa Muerte". (2RR pp.153-177). However, Ms. Salinas' testimony did not encompass Appellant having any problems with alcohol, drugs, criminal convictions or a known history of family violence. (2RR pp.153-177). On cross-examination, Ms. Salinas admitted not having any personal knowledge about Appellant's current abilities to care for her children or religious beliefs at the time of trial. (2RR pp.171-177). Most importantly, Ms. Salinas' testimony offered no evidence of any specific, identifiable behavior, conduct or omissions of the parent that would, to a reasonable degree of certainty, probably cause significant impairment to the children's physical or emotional development. (2RR pp.153-177); See Gray v. Shook, 329 S.W.3d at 196 (evidence of harm must rise above mere speculation and be attributable to a specific, identifiable act or omission of the parent).

31

The second witness called by the Appellee was Herminia Martinez. Ms. Martinez offered less evidence than Ms. Salinas of any harm that would come to the children if Appellant would be appointed their sole managing conservator. (3RR pp.5-19). Mrs. Martinez testified to knowing Appellee for over twenty years and knew her both personally and professionally. (3RR p.5-10). Yet, Mrs. Martinez had no personal knowledge of Appellant's parenting abilities nor did she ever witness Appellant around Appellant's children. (3RR p. 17, line 15-20). She testified that her personal knowledge was limited to Appellee's interaction with the children and served to simply bolster Appellee's capability of being a good caretaker of the children. (3RR p. 17, line 5-20). Mrs. Martinez' confirmed the lack of communication Appellee had with Appellant before and after she left the United States, and that Appellant's husband communicated with Appellee regarding the children. (3RR pp.15-16). Mrs. Martinez offered no evidence of Appellant's use or abuse of alcohol or drugs, no evidence of a criminal history, and no evidence of any history of family violence. (3RR pp.5-19). Ms. Martinez testimony about Appellee being a capable caretaker of the children does nothing to rebut the parental presumption requiring that Appellant be appointed the sole managing conservator of the children. The Appellee, as non-parent, has the burden to show that appointment of the Appellant parent as managing conservator would significantly impair the child, either physically or emotionally, is not met by

evidence that shows she would be a better custodian of the child or that she has a strong and on-going relationship with the child; further, evidence of past misconduct alone is insufficient. In re S.M.D. 329 S.W.3d 8 (Tex. App. – San Antonio, 2010)(reh'g overruled, rev. dism'd).

Appellee testified but offered no evidence that proved that Appellant's appointment as sole managing conservator of the children would have significantly impaired the children's physical health or emotional development. (3RR pp. 20-122). Appellee testified that she had no evidence of Appellant directly relinquishing the children to her. (3RR pp.77-79, p.117, line 22-25 and p. 118). Appellee's testimony provides no evidence that Appellant used or abused alcohol or drugs, whether she had a criminal record, and/or a history of family violence. (3RR p.65). Appellee's testimony does nothing more than solidify that her only motive in this suit was to prevent Appellant from having sole managing conservatorship of her children because of an unsubstantiated belief that Appellant had a hand in her son's death and is an unfit mother, generally. (3RR pp. 66-67, pp.70-71, pp. 93-95, pp.105-107, pp. 110-113, pp. 115-118, p.121). Yet, Appellee could not provide direct evidence of the source of her misguided opinion, nor did she provide any evidence that these beliefs were a legitimate concern for the trial court. Appellee did not meet the legally or factually sufficient threshold of evidence required to prove by a preponderance of such evidence that Appellant's

appointment as sole managing conservator of her biological children would significantly impair the physical health or emotional development of these children. Danet v. Bhan, 436 S.W.3d 793, 796 (Tex. 2014), Critz v. Critz, 297 S.W.3d 464, 470 (Tex.App.-Fort Worth 2009, no pet.), Chavez v. Chavez, 148 S.W. 3d 449, 459-60 (Tex.App.-El Paso, no pet.), See, also, Tex. Fam. Code Ann. §153.131.

The only evidence of Appellant's capability of caring for her children and being an active caretaker was provided by the witness, Rose Lerma. (3RR p.129) Ms. Lerma helped Appellant from April 2014 until July 2014 with her children and the general day to day task of keep her home in order. (3RR p.131-132). Ms. Lerma testified the Appellant was a great mother and was a great caretaker of her children. (3RR pp.133-135). Ms. Lerma also testified that she never witnessed any violence on the part of Appellant, nor did she witness any use of drugs or alcohol the entire time she worked for her. (3RR pp. 133-135). Ms. Lerma also testified that Appellant had stayed a considerable amount of time with her family in Mexico and knew her to be a good person. (3RR p.130). The reason she ceased her employment with Appellant was due to the children being removed from Appellant's home on July 11, 2014 by Appellee. (3RR p.133). This witness provided the most insight as to Appellant's ability as a parent and a mother to the children in this suit in relation to the time period that these issues were being

litigated. The testimony of all Appellee's witnesses was diminished with the honest and unbiased testimony offered by Ms. Lerma. She clearly and unequivocally voiced her opinion of Appellant as a capable mother that loved her children. (3RR pp.129-136).

To discharge her burden of rebutting this parental presumption to prevent Appellant from being appointed sole managing conservator of the children, the Appellee was required to offer evidence of specific actions or omissions of the Appellant that demonstrate that appointing Appellant as conservator would result in physical or emotional harm to the children. Lewelling v. Lewelling, 796 S.W.2d 164 (Tex. 1990); Brigham v. Brigham 863 S.W.2d 761 (Tex.App.- Dallas, 1993)(citing Lewelling v. Lewelling, 796 S.W.2d 164 (Tex. 1990)).

The Appellee offered no evidence that Appellant was presently engaged in some detrimental immoral or criminal conduct that this and other Texas courts have found to pose a real, rather than a speculative, harm to a child's physical health or emotional development, e.g. illegal drug use, alcohol abuse, family violence against her spouse or the children, drug dealing, or other criminal activity. May v. May, 829 S.W.2d 373, 376 (Tex. App.-Corpus Christi 1992, writ denied; see, e.g. Compton v. Pfannenstiel, 428 S.W.3d 881 (Tex. App.--Houston [1st Dist.] 2014)(mother's drug-dealing, neglect and physical abuse of children would result in physical or emotional harm to children). The trial court erred in finding that

35

Appellant's appointment as sole managing conservator was not in the children's best interest, particularly in light of the legally and factually insufficient evidence at trial on this issue. Shook v. Gray, 381 S.W.3d 540 (Tex. 2012), See, TEX. FAM. CODE ANN. §153.002.

Gray v. Shook, 329 S.W.3d 186, (Tex.App.-Corpus Christi 2010) should set the standard for deciding whether appointing Appellant as sole managing conservator will impair the children's physical or emotional development. In Gray, this honorable court reversed the trial court on the grounds that the trial court had abused its discretion in appointing a grandmother sole managing conservator of the child made the subject of the underlying suit in that case, in light of the absence of a preponderance of the evidence that father's appointment as managing conservator of the child would significantly impair the child's physical health or emotional development. Gray v. Shook, 329 S.W.3d 186, 197 (Tex.App.-Corpus Christi 2010, rev'd). This Court found that the potential for future harm and the lack of present harm were insufficient to substantiate a finding of fact or conclusion of law that the parent's appointment as sole managing conservator would significantly impair the child's physical health or emotional development, when that speculative harm was simply "uprooting" the child from their present residence. Gray v. Shook, 329 S.W.3d 186, 197 (Tex.App.-Corpus Christi 2010, rev'd)(citing May v. May, 829 S.W.2d 373, 376-77 (Tex.App.-Corpus Christi

1992, writ denied), See also, Lewelling v. Lewelling, 796 S.W.2d 164, 167 (Tex. 1990). This court quoted the Texas Supreme Court's holding in Lewelling v. Lewelling that "specific acts or omissions of the parent that demonstrate an award of custody to the parent would result in physical or emotional harm to the child" would be required to be established by a preponderance of the evidence by the nonparent to meet the standard of proof under TEX. FAM. CODE ANN. §153.131. Id. The Supreme Court in Shook affirmed the holding by this court regarding the lack of legally and factually sufficient evidence proffered at trial by the nonparent. Shook v. Gray, 381 S.W.3d 540, 543 (Tex. 2012). The Supreme Court agreed with this court's analysis of the evidence and agreed with remanding the case back to the trial court for a hearing on conservatorship. Id. In the instant case, the record is devoid of any evidence that Appellant posed an actual danger to her children or that future harm would be a concern, if Appellant were to be appointed sole managing conservator of her children. (3RR p.117, line 22-25 and p. 118). This court should find as it did in Gray that the trial court abused its discretion in appointing Appellee sole managing conservator of all four children, without legally and factually sufficient evidence to support its Findings of Fact Nos. 2, 4 and 5. Gray v. Shook, 329 S.W.3d 186, 197 (Tex.App.-Corpus Christi 2010, rev'd).

Thus, Appellee failed to show by a preponderance of the evidence that appointment of the Appellant as sole managing conservator of the children would

not be in the children's best interest because the appointment would significantly impair the children's physical health or emotional development. Alternatively, and without waiving the legally sufficiency challenge, the evidence is factually insufficient to show that appointment of the Appellant as sole managing conservator of the children would not be in the children's best interest because the appointment would significantly impair the children's physical health or emotional development.

Therefore, the evidence is legally and factually insufficient to support the trial court's Finding of Fact Nos. 2, 4 and 5, and the court abused its discretion in appointing Appellee as sole managing conservator of the children on voluntary relinquishment grounds. The court erred in not making findings of facts which demonstrated Appellant's voluntary relinquishment that would support these Findings of Fact Nos. 2, 4 and 5.

The evidence presented by the Appellee to rebut the parental presumption through either voluntary relinquishment or significant impairment grounds is legally and factually insufficient to support the trial court's findings of fact. Thus, the trial court's judgment should be reversed and judgment rendered for Appellant. Alternatively, should the court find the evidence factually insufficient, the trial court's judgment should be reversed and the case remanded to the trial court for a new trial and further fact-finding.

**PRAYER**

Appellant requests this Court consider the issues presented for review and that upon such consideration that the trial court's judgment should be reversed and judgment rendered for Appellant. Alternatively, should the court find the evidence factually insufficient, the trial court's judgment should be reversed and the case remanded to the trial court for a new trial and further fact-finding.

**CERTIFICATE OF COMPLIANCE**

Pursuant to Texas Rules of Appellate Procedure 9.4(i)(3), I hereby certify that this brief contains 7,542 words (excluding the caption, table of contents, table of authorities, signature, proof of service, certification and certificate of compliance). This is a computer-generated document created in Microsoft Word, using 14-point typeface for all text, except for footnoted which are 12-point typeface. In making this certificate of compliance, I am relying on the word count provided by the software used to prepare the document.

Respectfully submitted,
PEÑA GARCIA GUERRERO PLLC
900 Kerria Avenue
McAllen, TX 78501
t: 956.948.2221
f: 888.422.6821

By: /s/ Francisco Guerrero II
Francisco Guerrero, II
SBN 24047588
fg@pgglex.com
ATTORNEY FOR APPELLANT

## CERTIFICATE OF SERVICE

I, Francisco Guerrero II, certify that a true and correct copy of the foregoing APPELLANT'S BRIEF was served on opposing counsel in accordance with the Texas Rules of Appellate Procedure 9.5 on the 21th day of July 2015

**VIA FAX**

The Firm of Roel "Robie" Flores
3331 N. Ware Rd
Mc Allen, Texas 78501
Ph. (956) 631-7188
Fx. (956) 631-7268
robiefloreslaw@att.net

/s/ Francisco Guerrero II
Francisco Guerrero II

**APPENDIX**

Tab No. 1 – Trial court's final judgment

Tab No. 2 – Trial court's findings of fact and conclusions of law

Tab No. 3 – <u>Critz v. Critz</u>

Tab No. 4 – <u>Gray v. Shook</u>

Tab No. 5 – <u>Shook v. Gray</u>

## CAUSE NO: F-3928-14-D

| | | |
|---|---|---|
| IN THE INTEREST OF | § | IN THE JUDICIAL DISTRICT |
| | § | |
| LARRY D. JONES III, | § | |
| ALEXANDRA Y. JONES, | § | |
| WILLIAM F. JONES AND | § | 206th DISTRICT COURT |


| | | |
|---|---|---|
| IN THE INTEREST OF | § | IN THE JUDICIAL DISTRICT |
| | § | |
| LARRY D. JONES III, | § | |
| ALEXANDRA Y. JONES, | § | |
| WILLIAM F. JONES AND | § | 206th DISTRICT COURT |
| CATHERINE JONES | § | |
| | § | |
| MINOR CHILDREN | § | HIDALGO COUNTY, TEXAS |

## ORDER IN SUIT AFFECTING THE PARENT CHILD RELATIONSHIP

On the 17th and 18th day of December, 2014, the Court heard Petitioner's Suit Affecting the Parent Child Relationship.

### Appearances

Petitioner, **HELEN JONES** appeared in person and through attorney of record, Roel "Robie" Flores, and announced ready for trial.

Respondent, **BLANCA ESTELA JONES** appeared in person and through attorney of record Francisco Guerrero announced ready for trial.

### Jurisdiction

The Court, after examining the record and the agreement of the parties and hearing the evidence and argument of counsel, finds that all necessary prerequisites of the law have been legally satisfied and that the Court has jurisdiction of this case and of all the parties.

### Findings

The court finds that the **HELEN JONES**, grandparent had standing to bring this suit and the parties agreed that she had standing.

The court finds pursuant to section 153.131 and 153.373 that the presumption that a parent should be appointed or retained as managing conservator of the children is rebutted since the court finds the appointment of the parent would significantly impair the child's physical health or emotional development. In addition the court finds that the parent voluntarily relinquished the actual care, control and possession of the child to the paternal grandparent, **HELEN JONES** six months or more. In addition, the court finds it is in the children's best interest that **HELEN JONES** be appointed as the sole managing conservator.

Z:\CLIENTS\Jones, Helen 14-057\63-Order In Suit Affecting the Parent Child Relationship.wpd        1

110

### Children

The following orders are for the safety and welfare and in the best interest of the following children:

The Court finds that Petitioner, **HELEN JONES** and Respondent are the conservator's of the following children:

**NAME:** LARRY D. JONES III
**SEX:** Male
**BIRTHDATE:** 11-3-2007
**BIRTHPLACE:** Rio Grande City, Starr County, Texas

**NAME:** ALEXANDRA Y. JONES
**SEX:** Female
**BIRTHDATE:** 3-5-2009
**BIRTHPLACE:** Mission, Hidalgo County, Texas

**NAME:** WILLIAM F. JONES
**SEX:** Male
**BIRTHDATE:** 12-31-2010
**BIRTHPLACE:** Mission, Hidalgo County Texas

**NAME:** CATHERINE JONES
**SEX:** Female
**BIRTHDATE:** 5-6-2013
**BIRTHPLACE:** Monterrey Mexico

The Court finds no other children of the marriage are expected.

### Conservatorship

The Court, having considered the circumstances of **HELEN JONES**, grandparent, **BLANCA ESTELA JONES** and of the children, finds that the following orders are in the best interest of the children.

IT IS ORDERED that **HELEN JONES** is appointed Sole Managing Conservator and **BLANCA ESTELA JONES** is appointed Possessory Conservator of the following children.: **Larry D. Jones III, Alexandra Y. Jones, William F. Jones and Catherine Jones.**

IT IS ORDERED that, at all times, **HELEN JONES** , as a non parent sole managing conservator, and **BLANCA ESTELA JONES** , as a parent possessory conservator, shall

Z:\CLIENTS\Jones, Helen 14-057\63-Order In Suit Affecting the Parent Child Relationship.wpd　　　2

111

each have the following rights:

1.      the right to receive information from any other conservator of the children concerning the health, education, and welfare of the children;

2.      the right to confer with the other conservator to the extent possible before making a decision concerning the health, education, and welfare of the children;

3.      the right of access to medical, dental, psychological, and educational records of the children;

4.      the right to consult with a physician, dentist, or psychologist of the children;

5.      the right to consult with school officials concerning the children's welfare and educational status, including school activities;

6.      the right to attend school activities.

7.      the right to be designated on the children's records as a person to be notified in case of an emergency;

8.      the right to consent to medical, dental, and surgical treatment during an emergency involving an immediate danger to the health and safety of the children and

9.      the right to manage the estate of the children to the extent the estate have been created by the conservator or the parent's family.

### Duties at All Times

IT IS ORDERED that, at all times, **HELEN JONES** , as a non parent sole managing conservator, and **BLANCA ESTELA JONES** , as a parent possessory conservator, shall each have the following duties:

1.      the duty to inform the other conservators of the children in a timely manner of significant information concerning the health, education, and welfare of the children; and

2.      the duty to inform the other conservators of the children if the conservator resides with for at least thirty days, marries, or intends to marry a person who the conservator knows is registered as a sex offender under chapter 62 of the Code of Criminal Procedure or is currently charged with an offense for which on conviction the person would be required to register under that chapter. IT IS ORDERED that this information shall be tendered in the form of a notice made as soon as practicable, but not later than the fortieth

Z:\CLIENTS\Jones, Helen 14-057\63-Order In Suit Affecting the Parent Child Relationship.wpd          3

day after the date the conservator of the children begins to reside with the person or on the tenth day after the date the marriage occurs, as appropriate. IT IS ORDERED that the notice must include a description of the offense that is the basis of the person's requirement to register as a sex offender or of the offense with which the person is charged. WARNING: A CONSERVATOR COMMITS AN OFFENSE PUNISHABLE AS A CLASS C MISDEMEANOR IF THE CONSERVATOR FAILS TO PROVIDE THIS NOTICE.

### Rights and Duties during Periods of Possession

IT IS ORDERED that, during their respective periods of possession, **HELEN JONES**, as a sole managing conservator, and **BLANCA ESTELA JONES**, as a parent possessory conservator has the following rights and duties:

1. the duty of care, control, protection, and reasonable discipline of the children;
2. the duty to support the children, including providing the children with clothing, food, shelter, and medical and dental care not involving an invasive procedure;
3. the right to consent for the children to medical and dental care not involving an invasive procedure; and
4. the right to direct the moral and religious training of the children.

### Exclusive Rights and Duty of Sole Managing Conservator

IT IS ORDERED that **HELEN JONES**, as sole managing conservator, shall have the following exclusive rights and duty:

1. the right to designate the primary residence of the children;
2. the right to consent to medical, dental, and surgical treatment involving invasive procedures;
3. the right to consent to psychiatric and psychological treatment of the children;
4. the right to receive and give receipt for periodic payments for the support of the children and to hold or disburse these funds for the benefit of the children;
5. the right to represent the children in legal action and to make other decisions of substantial legal significance concerning the children;
6. the right to consent to marriage and to enlistment in the armed forces of the United States;

Z:\CLIENTS\Jones, Helen 14-057\63-Order In Suit Affecting the Parent Child Relationship.wpd     4

113

7. the right to make decisions concerning the children's education;

8. except as provided by section 264.0111 of the Texas Family Code, the right to the services and earnings of the children;

9. except when a guardian of the children's estates or a guardian or attorney ad litem has been appointed for the children, the right to act as an agent of the children in relation to the children's estates if the children's action is required by a state, the United States, or a foreign government; and

10. the duty to manage the estates of the children to the extent the estates have been created by community property or estate created by the sole managing conservator.

### Special Provision

IT IS ORDERED that the **BLANCA ESTELA JONES** AND **HELEN JONES** are prohibited directly or through third parties from taking the children into Mexico for any purpose.

### Passport Application

If **HELEN JONES**, the sole managing conservator applies for a passport of the children, **BLANCA ESTELA JONES** is required to consent for the issuance of the passport. The passport shall be held by **HELEN JONES**. In addition, if **BLANCA ESTELA JONES** is in possession of the children's passports she shall tender the passport's to **HELEN JONES** immediately.

### Standard Possession Order

The Court finds that the following provisions of this Standard Possession Order are intended to and do comply with the requirements of Texas Family code Sections 153.311 through 153.317. IT IS ORDERED that each conservator shall comply with all terms and conditions of this Standard Possession Order is effective immediately and applies to all periods of possession occurring on and after the date the Court signs this Standard Possession Order. IT IS THEREFORE, ORDERED:

### (a) Definitions

1. In this Standard Possession Order "school" means the primary or secondary school in which the children are enrolled or, if the children are not enrolled in a primary or secondary school, the public school district in which the children primarily resides.

2. In this Standard Possession Order "child" includes each child, whether one or

Z:\CLIENTS\Jones, Helen 14-057\63-Order In Suit Affecting the Parent Child Relationship.wpd          5

114

more, who is a subject of this suit while that child is under the age of eighteen years and not otherwise emancipated.

### (b) Mutual Agreement or Specified Terms for Possession

**IT IS ORDERED that the conservators shall have possession of the children at times mutually agreed to in advance by the parties,** and, in the absence of mutual agreement, IT IS ORDERED that the conservators shall have possession of the children under the specified terms set out in this Standard Possession Order.

### (c) Parents Who Reside 100 Miles or Less Apart

Except as otherwise explicitly provided in this Standard Possession Order, when **BLANCA ESTELA JONES** resides 100 miles or less from the primary residence of the children, **BLANCA ESTELA JONES** shall have he right to possession of the children as follows:

1. **Weekends** – On weekends throughout the year, commencing at 6:00 p.m. on the first, third, and fifth Friday of each month and ending on 6:00 p.m. on the following Sunday.

2. **Weekend Possession Extended by a Holiday** – Except as otherwise explicitly provided in this Standard Possession Order, if a weekend period of possession by **BLANCA ESTELA JONES** begins on a Friday that is a school holiday during the regular school term or a federal, state, or local holiday during the summer months when school is not in session, or if the period ends on or is immediately followed by a Monday that is such a holiday, that weekend period of possession shall begin at the time the children's preceding the Friday holiday or school holiday or end at the time school resumes after that school holiday, as applicable.

3. **Thursdays** –On Thursday of each week during the regular school term, beginning at 6:00 p.m. and ending at 8:00 p.m.

4. **Spring Break in Even-Numbered Years** – In even-numbered years, beginning at the time the children's school is regularly dismissed on the day the children are dismissed from school for the school's spring vacation and ending at 6:00 p.m. on the day before school resumes.

5. Extended Summer Possession by **BLANCA ESTELA JONES** –

With Written Notice by April 1 - If **BLANCA ESTELA JONES** gives **HELEN JONES** written notice by April 1 of a year specifying an extended period of periods of summer possession for that year, **BLANCA ESTELA JONES** shall have possession of the child for thirty days beginning no earlier than the day after the children's school is dismissed for the summer vacation and ending no later than seven days before school resumes at the end of the summer vacation in that year, to be exercised in no more than two separate

periods of at least seven consecutive days each, as specified in the written notice. These periods of possession shall begin and end at 6:00 p.m.

6.   **Without Written Notice by April 1** – If **BLANCA ESTELA JONES** does not give **HELEN JONES** written notice by April 1 of a year specifying an extended period or periods of summer possession for that year, **BLANCA ESTELA JONES** shall have possession of the children for thirty consecutive days in that year beginning at 6:00 p.m. on July 1 and ending on July 31 at 6:00 p.m.

Notwithstanding the weekend and Thursday periods of possession ORDERED for **BLANCA ESTELA JONES** , it is explicitly ORDERED that **HELEN JONES** shall have a superior right of possession of the child as follows:

1.   **Spring Break in Odd-Numbered Years** – In odd-numbered years, beginning at the time the children's school is regularly dismissed on the day the children are dismissed from school for the school vacation and ending at 6:00 p.m. on the day before school resumes.

2.   **Summer Weekend Possession by HELEN JONES**– If **HELEN JONES** gives **BLANCA ESTELA JONES** written notice by April 15 of a year, **HELEN JONES** shall have possession of the children on any one weekend beginning at 6:00 p.m. on Friday and ending at 6:00 p.m. on the following Sunday during any period of the extended summer possession by **BLANCA ESTELA JONES** in that year, provided that **HELEN JONES** picks up the children from **BLANCA ESTELA JONES** and returns the children to that same place and that the weekend so designated does not interfere with Father's Day Weekend.

3.   **Extended Summer Possession by HELEN JONES** – If **HELEN JONES** gives **BLANCA ESTELA JONES** written notice by April 15 of a year or gives **BLANCA ESTELA JONES** fourteen days' written notice on or after April 16 of a year, **HELEN JONES** may designate one weekend beginning no earlier than the day after the children's school is dismissed for the summer vacation and ending no later than seven days before school resumes at the end of the summer vacation, during which an otherwise scheduled weekend period of possession by **BLANCA ESTELA JONES** shall not take place in that year, provided that the weekend so designated does not interfere with **BLANCA ESTELA JONES** 's period or periods of extended summer possession or with Father's Day Weekend.

**(d)   Holidays Unaffected by Distance**

Notwithstanding the weekend and Thursday periods of possession of **BLANCA ESTELA JONES** , **BLANCA ESTELA JONES** and **HELEN JONES** shall have the right to possession of the children as follows:

1.   **Christmas Holidays in Even-Numbered Years**- In even-numbered years, **BLANCA ESTELA JONES** shall have the right to possession of the children beginning at the time the children's school is regularly dismissed on the day the children are dismissed from school for the Christmas school vacation and ending at noon on

December 28, and **HELEN JONES** shall have the right to possession of the children beginning at noon on December 28 and ending at 6:00 p.m. on the day before school resumes.

2.    **Christmas Holidays in Odd-Numbered Years-** In odd-numbered years, **HELEN JONES** shall have the right to possession of the child beginning at the time the children's school is regularly dismissed on the day the children are dismissed from school for the Christmas school vacation and ending at noon on December 28, and **BLANCA ESTELA JONES** shall have the right to possession of the children beginning at noon on December 28 and ending at 6:00 p.m. on the day before school resumes.

3.    **Thanksgiving in Odd-Numbered Years-** In odd-numbered years, **BLANCA ESTELA JONES** shall have the right to possession of the children beginning at the time the children's school is regularly dismissed on the day the children are dismissed from school for the Thanksgiving holiday and ending at 6:00 p.m. on the day before school resumes.

4.    **Thanksgiving in Even-Numbered Years-** In even-numbered years, **HELEN JONES** shall have the right to possession of the children beginning at the time the children's school is regularly dismissed on the day the children are dismissed from school for the Thanksgiving holiday and ending at 6:00 p.m. on the day before school resumes.

5.    **Children's Birthday-** If a parent is not otherwise entitled under this Standard Possession Order to present possession of children on the children's birthday, that parent shall have possession of the children and the children's minor siblings beginning at 6:00 p.m. and ending at 8:00 p.m. on that day, provided that that parent picks up the children from the other conservator's residence and returns the children to that same place.

6.    Mother's Day Weekend- **BLANCA ESTELA JONES** shall have the right to possession of the children each year, beginning at 6:00 p.m. on the Friday preceding Mother's Day and ending at 6:00 p.m. on Mother's Day, provided that if **BLANCA ESTELA JONES** is not otherwise entitled under this Standard Possession Order to take possession of the children, she shall pick up the children from **HELEN JONES 's** residence and return the children to that same place.

### (e) Parents Who Reside More Than 100 Miles Apart

Except as otherwise explicitly provided in this Standard Possession Order, when **BLANCA ESTELA JONES** resides more than 100 miles from the residence of the child, **BLANCA ESTELA JONES** shall have the right to possession of the child as follows:

1.    Weekends—Unless **BLANCA ESTELA JONES** elects the alternative period of weekend possession described in the next paragraph, **BLANCA ESTELA JONES** shall have the right to possession of the child on weekends, beginning at 6:00 p.m. on the first, third, and fifth Friday of each month and ending at 6:00 p.m. Sunday after the weekend. Except as otherwise explicitly provided in this Standard Possession Order, if

such a weekend period of possession by **BLANCA ESTELA JONES** begins on a Friday that is a school holiday during the regular school term or a federal, state, or local holiday during the summer months when school is not in session, or if the period ends on or is immediately followed by a Monday that is such a holiday, that weekend period of possession shall begin at 6:00 P.M. on the Thursday immediately preceding the Friday holiday or school holiday or end 6:00 P.M. on that Monday holiday or school holiday, as applicable.

Alternate Weekend Possession—In lieu of the weekend possession described in the foregoing paragraph, **BLANCA ESTELA JONES** shall have the right to possession of the child not more than one weekend per month of **BLANCA ESTELA JONES's** choice beginning at 6:00 P.M. on the day school recesses for the weekend and ending at 6:00 p.m. on Sunday after the weekend. Except as otherwise explicitly provided in this Standard Possession Order, if such a weekend period of possession by **BLANCA ESTELA JONES** begins on a Friday that is a school holiday during the regular school term or a federal, state, or local holiday during the summer months when school is not in session, or if the period ends on or is immediately followed by a Monday that is such a holiday, that weekend period of possession shall begin at 6:00 P.M. on the Thursday immediately preceding the Friday holiday or school holiday or end at 6:00 P.M. on that Monday holiday or school holiday, as applicable. **BLANCA ESTELA JONES** may elect an option for this alternative period of weekend possession by giving written notice to **HELEN JONES** within ninety days after the parties begin to reside more than 100 miles apart. If **BLANCA ESTELA JONES** makes this election, **BLANCA ESTELA JONES** shall give **HELEN JONES** fourteen days' written or telephonic notice preceding a designated weekend. The weekends chosen shall not conflict with the provisions regarding Christmas, Thanksgiving, the child's birthday, and Mother's Day Weekend below.

2.　Spring Break in All Years—Every year, beginning at 6:00 P.M. on the day the child is dismissed from school for the school's spring vacation and ending at 6:00 P.M. on the day before school resumes after that vacation.

3.　Extended Summer Possession by **BLANCA ESTELA JONES**—
With Written Notice by April 1—If **BLANCA ESTELA JONES** gives **HELEN JONES** written notice by April 1 of a year specifying an extended period or periods of summer possession for that year, **BLANCA ESTELA JONES** shall have possession of the child for forty-two days beginning no earlier than the day after the child's school is dismissed for the summer vacation and ending no later than seven days before school resumes at the end of the summer vacation in that year, to be exercised in no more than two separate periods of at least seven consecutive days each, as specified in the written notice, provided that the period or periods of extended summer possession do not interfere with Mother's Day Weekend. These periods of possession shall begin and end at 6:00 P.M.

Without Written Notice by April 1—If **BLANCA ESTELA JONES** does not give **HELEN JONES** written notice by April 1 of a year specifying an extended period or periods of summer possession for that year, **BLANCA ESTELA JONES** shall have possession of the child for forty-two consecutive days beginning at 6:00 P.M. on June 15 and ending at 6:00 P.M. on July 27 of that year.

Notwithstanding the weekend periods of possession ORDERED for **BLANCA ESTELA JONES** it is explicitly ORDERED that **HELEN JONES** shall have a superior right of possession of the child as follows:

1.     Summer Weekend Possession by **HELEN JONES** - If **HELEN JONES** gives **BLANCA ESTELA JONES** written notice by April 15 of a year, **HELEN JONES** shall have possession of the child on any one weekend beginning at 6:00 P.M. on Friday and ending at 6:00 P.M. on the following Sunday during any one period of possession by **BLANCA ESTELA JONES** during **BLANCA ESTELA JONES's** extended summer possession in that year, provided that if a period of possession by in that year exceeds thirty **BLANCA ESTELA JONES** days, **HELEN JONES** may have possession of the child under the terms of this provision on any two non consecutive weekends during that period and provided that **HELEN JONES** picks up the child from **BLANCA ESTELA JONES** and returns the child to that same place and that the weekend so designated does not interfere with Father's Day Weekend.

2.     Extended Summer Possession by **HELEN JONES** —If **HELEN JONES** gives **BLANCA ESTELA JONES** written notice by April 15 of a year, **HELEN JONES** may designate twenty-one days beginning no earlier than the day after the child's school is dismissed for the summer vacation and ending no later than seven days before school resumes at the end of the summer vacation in that year, to be exercised in no more than two separate periods of at least seven consecutive days each, during which **BLANCA ESTELA JONES** shall not have possession of the child, provided that the period or periods so designated do not interfere with **BLANCA ESTELA JONES** period or periods of extended summer possession or with Father's Day Weekend.

**(f)     Undesignated Periods of Possession**

**HELEN JONES** shall have the right of possession of the children at all other times not specifically designated in this Standard Possession Order for **BLANCA ESTELA JONES** .

**(g)     General Terms and Conditions**

Except as otherwise explicitly provided in this Standard Possession Order, the terms and conditions of possession of the children that apply regardless of the distance between the residence of a parent and the children are as follows:

1.  **Surrender of Children by HELEN JONES-HELEN JONES** is ORDERED to surrender the children to **BLANCA ESTELA JONES**  at the beginning of each period of **BLANCA ESTELA JONES's**  possession at the residence of **HELEN JONES**.

If a period of possession by **BLANCA ESTELA JONES**  begins at the time the children's school is regularly dismissed, **HELEN JONES** is ORDERED to surrender the children to **BLANCA ESTELA JONES**  at beginning of each such period of possession at the school in which the children is enrolled. If the children are not in school, **BLANCA ESTELA JONES**  shall pick up the children at the residence of **HELEN JONES**, and **HELEN JONES** is ORDERED to surrender the children to **BLANCA ESTELA JONES**  at

Z:\CLIENTS\Jones. Helen 14-057\63-Order In Suit Affecting the Parent Child Relationship.wpd          10

119

the residence of **HELEN JONES** under these circumstances.

2. **Return of Children by BLANCA ESTELA JONES** - BLANCA ESTELA JONES is ORDERED to return the children to the residence of **HELEN JONES** at the end of each period of possession.

If a period of possession by **BLANCA ESTELA JONES** ends at the time the children's school resumes, **BLANCA ESTELA JONES** is ORDERED to surrender the children to **HELEN JONES** at the end of each such period of possession at the school in which the children are enrolled or, if the children are not in school, at the residence of **HELEN JONES**.

3. **Surrender of Children by BLANCA ESTELA JONES** - BLANCA ESTELA JONES is ORDERED to surrender the children to **HELEN JONES**, if the children are in **BLANCA ESTELA JONES** ' possession or subject to **BLANCA ESTELA JONES** control, at the beginning of each period of **HELEN JONES'** exclusive periods of possession, at the place designated in this Standard Possession Order.

4. **Return of Children by HELEN JONES**- HELEN JONES is ORDERED to return the children to **BLANCA ESTELA JONES** , if **BLANCA ESTELA JONES** is entitled to possession of the children, at the end of each of **HELEN JONES'** exclusive periods of possession, at the place designated in this Standard Possession Order.

5. **Personal Effects**- Each conservator is ORDERED to return with the children the personal effects that the children brought at the beginning of the period of possession.

6. **Designation of Competent Adult**- Each conservator may designate any competent adult to pick up and return the children, as applicable. IT IS ORDERED that a conservator or a designated competent adult be present when the child is picked up or returned.

7. **Inability to Exercise Possession**- Each conservator is ORDERED to give notice to the person in possession of the children on each occasion that the conservator will be unable to exercise that conservator's right of possession for any specified period.

8. **Written Notice**- Written notice shall be deemed to have been timely made if received or postmarked before or at the time that notice is due.

This concludes the Standard Possession Order.

### Child Support

IT IS ORDERED that **BLANCA ESTELA JONES** is obligated to pay and shall pay to **HELEN JONES** child support of $355.00 per month, with the first payment being due and payable on January 1, 2015 and a like payment being due and payable on the first (1st) day of each month thereafter until the first month following the date of the earliest occurrence of one of the events specified below:

1.    any child reaches the age of eighteen years or graduates from high school, whichever occurs later, subject to the provisions for support beyond the age of eighteen years set out below;

2.    any child marries;
3.    any child dies; or
4.    any child's disabilities are otherwise removed for general purposes.

If the child is eighteen years of age and has not graduated from high school, IT IS ORDERED that **BLANCA ESTELA JONES's** obligation to pay child support to **HELEN JONES** shall not terminate but shall continue for as long as the child is enrolled—

Thereafter, **BLANCA ESTELA JONES** is obligated to pay and shall pay to **HELEN JONES** child support of $304.00 per month, with the first payment being due and payable on the first (1st) day of each month thereafter until the first month following the date of the earliest occurrence of one of the events specified below:

1.    any child reaches the age of eighteen years or graduates from high school, whichever occurs later, subject to the provisions for support beyond the age of eighteen years set out below;

2.    any child marries;
3.    any child dies; or
4.    any child's disabilities are otherwise removed for general purposes.

If the child is eighteen years of age and has not graduated from high school, IT IS ORDERED that **BLANCA ESTELA JONES's** obligation to pay child support to **HELEN JONES** shall not terminate but shall continue for as long as the child is enrolled—

Thereafter, **BLANCA ESTELA JONES** is obligated to pay and shall pay to **HELEN JONES** child support of $253.00 per month, with the first payment being due and payable on the first (1st) day of each month thereafter until the first month following the date of the earliest occurrence of one of the events specified below:

1.    any child reaches the age of eighteen years or graduates from high school, whichever occurs later, subject to the provisions for support beyond the age of eighteen years set out below;

2.    any child marries;
3.    any child dies; or
4.    any child's disabilities are otherwise removed for general purposes.

If the child is eighteen years of age and has not graduated from high school, IT IS ORDERED that **BLANCA ESTELA JONES's** obligation to pay child support to **HELEN JONES** shall not terminate but shall continue for as long as the child is enrolled—

Thereafter, **BLANCA ESTELA JONES** is obligated to pay and shall pay to **HELEN JONES** child support of $203.00 per month, with the first payment being due and payable on the first (1st) day of each month thereafter until the first month following the date of the

Z:\CLIENTS\Jones, Helen 14-057\63-Order In Suit Affecting the Parent Child Relationship.wpd                    12

earliest occurrence of one of the events specified below:

1.    any child reaches the age of eighteen years or graduates from high school, whichever occurs later, subject to the provisions for support beyond the age of eighteen years set out below;

2.    any child marries;

3.    any child dies; or

4.    any child's disabilities are otherwise removed for general purposes.

If the child is eighteen years of age and has not graduated from high school, IT IS ORDERED that **BLANCA ESTELA JONES's** obligation to pay child support to **HELEN JONES** shall not terminate but shall continue for as long as the child is enrolled—

1.    under chapter 25 of the Texas Education Code in an accredited secondary school in a program leading toward a high school diploma or under section 130.008 of the Education Code in courses for joint high school and junior college credit and is complying with the minimum attendance requirements of subchapter C of chapter 25 of the Education Code or

2.    on a full-time basis in a private secondary school in a program leading toward a high school diploma and is complying with the minimum attendance requirements imposed by that school.

IT IS ORDERED that any employer of **BLANCA ESTELA JONES** shall be ordered to withhold from earnings for child support from the disposable earnings of **BLANCA ESTELA JONES** for the support of **Larry D. Jones III, Alexandra Y. Jones, William F. Jones and Catherine Jones.**

IT IS FURTHER ORDERED that all amounts withheld from the disposable earnings of **BLANCA ESTELA JONES** by the employer and paid in accordance with the order to that employer shall constitute a credit against the child support obligation. Payment of the full amount of child support ordered paid by this order through the means of withholding from earnings shall discharge the child support obligation. If the amount withheld from earnings and credited against the child support obligation is less than 100 percent of the amount ordered to be paid by this order, the balance due remains an obligation of **BLANCA ESTELA JONES** , and it is hereby ORDERED that **BLANCA ESTELA JONES** pay the balance due directly to the state disbursement unit as specified below.

On this date the Court authorized the issuance of an Order/Notice to Withhold Income for Child Support.

IT IS ORDERED that all payments shall be made through the state disbursement unit at Texas Child Support Disbursement Unit, P.O. Box 659791, San Antonio, Texas 78265-9791, and thereafter promptly remitted to **HELEN JONES** at 1212 Doe Run Hollow, Fredericksburg, Texas 78624 for the support of the children.

IT IS FURTHER ORDERED that **BLANCA ESTELA JONES** shall notify this Court and **HELEN JONES** by U.S. certified mail, return receipt requested, of any change of address and of any termination of employment. This notice shall be given no later than

Z:\CLIENTS\Jones, Helen 14-057\63-Order In Suit Affecting the Parent Child Relationship.wpd                13

seven days after the change of address or the termination of employment. This notice or a subsequent notice shall also provide the current address of **BLANCA ESTELA JONES** and the name and address of his current employer, whenever that information becomes available.

IT IS ORDERED that, on the request of a prosecuting attorney, the title IV-D agency, the friend of the Court, a domestic relations office, **HELEN JONES ,BLANCA ESTELA JONES** , or an attorney representing **HELEN JONES** or **BLANCA ESTELA JONES** , the clerk of this Court shall cause a certified copy of the Order/Notice to Withhold Income for Child Support to be delivered to any employer.

IT IS ORDERED that each party shall pay, when due, all fees charged to that party by the state disbursement unit and any other agency statutorily authorized to charge a fee.

*Health Insurance*

1.  Definitions—

"Health insurance" means insurance coverage that provides basic health-care services, including usual physician services, office visits, hospitalization, and laboratory, X-ray, and emergency services, that may be provided through a health maintenance organization or other private or public organization, other than medical assistance under chapter 32 of the Texas Human Resources Code.

"Reasonable cost" means the cost of a health insurance premium that does not exceed 10 percent of the responsible parent's net income in a month.

"Reasonable and necessary health-care expenses not paid by insurance and incurred by or on behalf of a child" include, without limitation, any copayments for office visits or prescription drugs, the yearly deductible, if any, and medical, surgical, prescription drug, mental health-care services, dental, eye care, ophthalmological, and orthodontic charges. These reasonable and necessary health-care expenses do not include expenses for travel to and from the health-care provider or for nonprescription medication.

"Furnish" means:

    a.    to hand deliver the document by a person eighteen years or older either to the recipient or to a person who is eighteen years or older and permanently resides with the recipient;

    b.    to deliver the document to the recipient by certified mail, return receipt requested, to the recipient's last known mailing or residence address; or

    c.    to deliver the document to the recipient at the recipient's last known mailing or residence address using any person or entity whose principal business is that of a courier or deliverer of papers or documents either within or outside the United States.

2.  Obligations of **HELEN JONES - HELEN JONES** is ORDERED to include the children in **HELEN JONES's** health insurance available through her employment or

through a private insurance no later than 30 days after the date the Court signs this order. Any expenses not covered by the health insurance shall be spit equally 50% by each party. **BLANCA ESTELA JONES** is ordered to reimburse HELEN JONES the cost of medical insurance up to **$112.00.**

3.    Obligations of **HELEN JONES—HELEN JONES** is ORDERED—

    a.    to furnish to each conservator of the children the following information no later than the thirtieth day after the date the notice of the rendition of this order is received:

        i.    the Social Security number of the parent providing insurance;
        ii.    the name and address of the employer of the parent providing insurance;
        iii.    whether the employer is self-insured or has health insurance available; .
        iv.    proof that health insurance has been provided for the children; and
        v.    the name of the health insurance carrier, the number of the policy, a copy of the policy and schedule of benefits, a health insurance membership card, claim forms, and any other information necessary to submit a claim or, if the employer is self-insured, a copy of the schedule of benefits, a membership card, claim forms, and any other information necessary to submit a claim;

    b.    to furnish to each conservator of the children a copy of any renewals or changes to the health insurance policy covering the children, or any additional information regarding health insurance coverage of the children, including any change in the actual cost of the health insurance for the children, no later than the fifteenth day after the party providing the health insurance receives or is provided with the renewal, change, or additional information;

    c.    to furnish each conservator of the children of any termination or lapse of the health insurance coverage of the children no later than the fifteenth day after the date of the termination or lapse;

    d.    after a termination or lapse of health insurance coverage, to furnish each conservator of the children with all documentation accessible to **HELEN JONES** of the availability of additional health insurance for the children no later than the fifteenth day after the date the insurance becomes available;

    e.    after a termination or lapse of health insurance coverage, to furnish each conservator of the children of the availability of enrollment of the children in a medical assistance program under chapter 32 of the Texas Human Resources Code or a state children health plan under

Z:\CLIENTS\Jones Helen 14-057163 Order In Suit Affecting the Parent Child Relationship.wpd    15

chapter 62 of the Texas Health and Safety Code, no later than the fifteenth day after the date the enrollment in the program becomes available;

f.  to enroll the children at the next available enrollment period in a health insurance plan that is available at reasonable cost after the previous health insurance has been terminated or has lapsed; and

g.  to enroll the children in a medical assistance program under chapter 32 of the Texas Human Resources Code or a state child health plan under chapter 62 of the Texas Health and Safety Code if the children is eligible for enrollment in the program and no health insurance plan is available at reasonable cost.

4.  Secondary Coverage—IT IS ORDERED that nothing in this order shall prevent either party from providing secondary health insurance coverage for the children at that party's sole cost and expense. IT IS FURTHER ORDERED that if a party provides secondary health insurance coverage for the children, both parties shall cooperate fully with regard to the handling and filing of claims with the insurance carrier providing the coverage in order to maximize the benefits available to the children and to ensure that the party who pays for health-care expenses for the children is reimbursed for the payment from both carriers to the fullest extent possible.

5.  Compliance with Insurance Company Requirements—Each party is ORDERED to conform to all requirements imposed by the terms and conditions of the policy of health insurance covering the children in order to assure maximum reimbursement or direct payment by the insurance company of the incurred health-care expense, including but not limited to requirements for advance notice to carrier, second opinions, and the like. Each party is ORDERED to attempt to use "preferred providers," or services within the health maintenance organization, if applicable; however, this provision shall not apply if emergency care is required. Disallowance of the bill by a health insurer shall not excuse the obligation of either party to make payment; however, if a bill is disallowed or the benefit reduced because of the failure of a party to follow procedures or requirements of the carrier, IT IS ORDERED that the party failing to follow the carrier's procedures or requirements shall be wholly responsible for the increased portion of that bill.

IT IS FURTHER ORDERED that no surgical procedure, other than in an emergency or one covered by insurance, shall be performed on the children unless the parent consenting to surgery has first consulted with at least two medical doctors, both of whom state an opinion that the surgery is medically necessary. IT IS FURTHER ORDERED that a parent who fails to obtain the required medical opinions before consent to surgery on the children shall be wholly responsible for all medical and hospital expenses incurred in connection therewith.

6.  Claims—Except as provided in this paragraph, the party who is not carrying the health insurance policy covering the children is ORDERED to furnish to the party carrying the policy, within fifteen days of receiving them, any and all forms, receipts, bills, and statements reflecting the health-care expenses the party not carrying the policy incurs on behalf of the children. In accordance with article 3.51-13 of the Texas Insurance Code, IT IS ORDERED that the party who is not carrying the health insurance policy covering the

children may, at that party's option, file directly with the insurance carrier with whom coverage is provided for the benefit of the children any claims for health-care expenses, including but not limited to medical, hospitalization, and dental costs, and receive payments directly from the insurance company.

The party who is carrying the health insurance policy covering the children is ORDERED to submit all forms required by the insurance company for payment or reimbursement of health-care expenses incurred by either party on behalf of the children to the insurance carrier within fifteen days of that party's receiving any form, receipt, bill, or statement reflecting the expenses.

7.    Constructive Trust for Payments Received—IT IS ORDERED that any insurance payments received by a party from the health insurance carrier as reimbursement for health-care expenses incurred by or on behalf of the children shall belong to the party who incurred and paid those expenses. IT IS FURTHER ORDERED that the party receiving the insurance payments is designated a constructive trustee to receive any insurance checks or payments for health-care expenses incurred and paid by the other party, and the party carrying the policy shall endorse and forward the checks or payments, along with any explanation of benefits received, to the other party within three days of receiving them.

8.    Health-Care Expenses Not Paid by Insurance—Subject to the provisions in paragraph immediately above, IT IS ORDERED that, if health-care expenses are incurred for the children, **BLANCA ESTELA JONES** and **HELEN JONES** shall pay all reasonable and necessary health-care expenses not paid by insurance and incurred by or on behalf of the children in the following portions:

a.    If the health-care expenses are incurred by using a HMO or PPO plan, in an emergency, or with the written agreement of the other party, **BLANCA ESTELA JONES** is ORDERED to pay 50 percent.

b.    Except in an emergency or if the other parent agreed in writing, if a party incurs health-care expenses for the children by using the services of health-care providers not employed by the HMO or approved by the PPO, the party incurring the services is ORDERED to pay 50 percent and the other party is ORDERED to pay 50 percent.

c.    If **HELEN JONES** provides health insurance for the children through an HMO or a PPO that does not provide coverage for the children where the children resides or have network providers in the area where the children resides, **BLANCA ESTELA JONES** is ORDERED to pay 50 percent and **HELEN JONES** is ORDERED to pay 50 percent.

d.    If the children are enrolled in a health-care plan that is not an HMO or a PPO, **BLANCA ESTELA JONES** is ORDERED to pay 50 percent and **HELEN JONES** is ORDERED to pay 50 percent.

e.    If the children were enrolled in a medical assistance program under chapter 32 of the Texas Human Resources Code or a state child

health plan under chapter 62 of the Texas Health and Safety Code and is no longer eligible for coverage in that plan or program, **BLANCA ESTELA JONES** is ORDERED to pay 50 percent and **HELEN JONES** is ORDERED to pay 50 percent until health insurance is provided for the children or the children are again eligible for enrollment in a medical assistance program under chapter 32 of the Texas Human Resources Code or a state child health plan under chapter 62 of the Texas Health and Safety Code.

IT IS ORDERED that the party who pays for a health-care expense on behalf of the children shall furnish to the other party, within thirty days of receiving them, all forms, receipts, bills, and explanations of benefits paid reflecting the uninsured portion of the health-care expenses the paying party incurs on behalf of the children. IT IS FURTHER ORDERED that if the paying party furnishes all of these forms, receipts, bills, and explanations of benefits to the nonpaying party within thirty days of receiving them, the nonpaying party shall pay his or her share of the uninsured portion of the health-care expenses either by paying the health-care provider directly or by reimbursing the paying party at the paying party's last known mailing or residence address for any advance payment exceeding the paying party's share of the expenses no later than thirty days after the nonpaying party receives the following documentation relating to the health-care expense:

    a.    a receipt for a prescription,
    b.    a receipt for a copayment for health-care services,
    c.    a receipt for health-care expenses of a type not covered by the health insurance plan, or
    d.    an explanation of benefits stating the benefits paid for all other health-care expenses.

If the paying party does not furnish to the nonpaying party all of the forms, receipts, bills, and explanations of benefits paid reflecting the uninsured portion of a health-care expense the paying party incurred on behalf of the children within thirty days of receiving these documents, IT IS ORDERED that the nonpaying party shall pay his or her share of the uninsured portion of the health-care expense either by paying the health-care provider directly or by reimbursing the paying party at the paying party's last known mailing or residence address for any advance payment exceeding the paying party's share of the expense no later than 120 days after the nonpaying party receives the documentation listed above in this section relating to the health-care expense.

IT IS ORDERED that reasonableness of the charges for health-care expenses shall be presumed when a party is furnished with the applicable documents for the charges and that disallowance of the bill by a health insurer shall not excuse that party's obligation to make payment or reimbursement as otherwise provided herein.

9.    Notice to Employer—On this date a Medical Support Notice was authorized to be issued by the Court. For the purpose of section 1169 of title 29 of the United States Code, the party not carrying the health insurance policy is designated the custodial parent and alternate recipient's representative.

10. WARNING—A PARENT ORDERED TO PROVIDE HEALTH INSURANCE OR TO PAY THE OTHER PARENT ADDITIONAL CHILD SUPPORT FOR THE COST OF HEALTH INSURANCE WHO FAILS TO DO SO IS LIABLE FOR NECESSARY MEDICAL EXPENSES OF THE Children], WITHOUT REGARD TO WHETHER THE EXPENSES WOULD HAVE BEEN PAID IF HEALTH INSURANCE HAD BEEN PROVIDED, AND FOR THE COST OF HEALTH INSURANCE PREMIUMS OR CONTRIBUTIONS, IF ANY, PAID ON BEHALF OF THE CHILDREN.

IT IS ORDERED that the provisions for child support in this order shall be an obligation of the estate of **BLANCA ESTELA JONES** and shall not terminate on the death of **BLANCA ESTELA JONES** .

### *Medical Notification*

Each party is ORDERED to inform the other party within 5 hours of any medical condition of the children requiring surgical intervention, hospitalization, or both.

Within 10days after the Court signs this decree, each party is ORDERED to execute—

1. all necessary releases pursuant to the Health Insurance Portability and Accountability Act (HIPAA) and 45 C.F.R. section 164.508 to permit the other conservator to obtain health-care information regarding the children; and

2. for all health-care providers of the children, an authorization for disclosure of protected health information to the other conservator pursuant to the HIPAA and 45 C.F.R. section 164.508

Each party is further ORDERED to designate the other conservator as a person to whom protected health information regarding the children may be disclosed whenever the party executes an authorization for disclosure of protected health information pursuant to the HIPAA and 45 C.F.R. section 164.508.

### *Required Information*

The information required for each party by section 105.006(a) of the Texas Family Code is as follows:

Name: **HELEN JONES**

Social Security number:           xxx-xx-x916_____
Driver's license number and issuing state:   xxxx_____ Texas
Current residence address:          1212 Doe Run Hollow,
Fredericksburg, Texas 78624
Mailing address:          Same
Home telephone number:        (956)212-2452
Name of employer:         N/A
Address of employment:       N/A
Work telephone number:       N/A

Name: **BLANCA ESTELA JONES**

Social Security number:        xxx-xx-x

Driver's license number and issuing state:    xxxx_____

Current residence address:

Mailing address:        Same

Home telephone number:

Name of employer:        None

Address of employment:

Work telephone number:

*Required Notices*

EACH PERSON WHO IS A PARTY TO THIS ORDER IS ORDERED TO NOTIFY EACH OTHER PARTY, THE COURT, AND THE STATE CASE REGISTRY OF ANY CHANGE IN THE PARTY'S CURRENT RESIDENCE ADDRESS, MAILING ADDRESS, HOME TELEPHONE NUMBER, NAME OF EMPLOYER, ADDRESS OF EMPLOYMENT, DRIVER'S LICENSE NUMBER, AND WORK TELEPHONE NUMBER. THE PARTY IS ORDERED TO GIVE NOTICE OF AN INTENDED CHANGE IN ANY OF THE REQUIRED INFORMATION TO EACH OTHER PARTY, THE COURT, AND THE STATE CASE REGISTRY ON OR BEFORE THE 60TH DAY BEFORE THE INTENDED CHANGE. IF THE PARTY DOES NOT KNOW OR COULD NOT HAVE KNOWN OF THE CHANGE IN SUFFICIENT TIME TO PROVIDE 60-DAY NOTICE, THE PARTY IS ORDERED TO GIVE NOTICE OF THE CHANGE ON OR BEFORE THE FIFTH DAY AFTER THE DATE THAT THE PARTY KNOWS OF THE CHANGE.

THE DUTY TO FURNISH THIS INFORMATION TO EACH OTHER PARTY, THE COURT, AND THE STATE CASE REGISTRY CONTINUES AS LONG AS ANY PERSON, BY VIRTUE OF THIS ORDER, IS UNDER AN OBLIGATION TO PAY CHILD SUPPORT OR ENTITLED TO POSSESSION OF OR ACCESS TO A CHILD.

FAILURE BY A PARTY TO OBEY THE ORDER OF THIS COURT TO PROVIDE EACH OTHER PARTY, THE COURT, AND THE STATE CASE REGISTRY WITH THE CHANGE IN THE REQUIRED INFORMATION MAY RESULT IN FURTHER LITIGATION TO ENFORCE THE ORDER, INCLUDING CONTEMPT OF COURT. A FINDING OF CONTEMPT MAY BE PUNISHED BY CONFINEMENT IN JAIL FOR UP TO SIX MONTHS, A FINE OF UP TO $500 FOR EACH VIOLATION, AND A MONEY JUDGMENT FOR PAYMENT OF ATTORNEY'S FEES AND COURT COSTS.

Notice shall be given to the other party by delivering a copy of the notice to the party by registered or certified mail, return receipt requested. Notice shall be given to the Court by delivering a copy of the notice either in person to the clerk of this Court or by registered or certified mail addressed to the clerk at 100 N. Closner, Edinburg, Texas. Notice shall be given to the state case registry by mailing a copy of the notice to State Case Registry, Contract Services Section, MC046S, P.O. Box 12017, Austin, Texas 78711-2017.

NOTICE TO ANY PEACE OFFICER OF THE STATE OF TEXAS: YOU MAY USE

REASONABLE EFFORTS TO ENFORCE THE TERMS OF CHILD CUSTODY SPECIFIED IN THIS ORDER. A PEACE OFFICER WHO RELIES ON THE TERMS OF A COURT ORDER AND THE OFFICER'S AGENCY ARE ENTITLED TO THE APPLICABLE IMMUNITY AGAINST ANY CLAIM, CIVIL OR OTHERWISE, REGARDING THE OFFICER'S GOOD FAITH ACTS PERFORMED IN THE SCOPE OF THE OFFICER'S DUTIES IN ENFORCING THE TERMS OF THE ORDER THAT RELATE TO CHILD CUSTODY. ANY PERSON WHO KNOWINGLY PRESENTS FOR ENFORCEMENT AN ORDER THAT IS INVALID OR NO LONGER IN EFFECT COMMITS AN OFFENSE THAT MAY BE PUNISHABLE BY CONFINEMENT IN JAIL FOR AS LONG AS TWO YEARS AND A FINE OF AS MUCH AS $10,000.

### Warnings

WARNINGS TO PARTIES: FAILURE TO OBEY A COURT ORDER FOR CHILD SUPPORT OR FOR POSSESSION OF OR ACCESS TO A CHILD MAY RESULT IN FURTHER LITIGATION TO ENFORCE THE ORDER, INCLUDING CONTEMPT OF COURT. A FINDING OF CONTEMPT MAY BE PUNISHED BY CONFINEMENT IN JAIL FOR UP TO SIX MONTHS, A FINE OF UP TO $500 FOR EACH VIOLATION, AND A MONEY JUDGMENT FOR PAYMENT OF ATTORNEY'S FEES AND COURT COSTS.

FAILURE OF A PARTY TO MAKE A CHILD SUPPORT PAYMENT TO THE PLACE AND IN THE MANNER REQUIRED BY A COURT ORDER MAY RESULT IN THE PARTY'S NOT RECEIVING CREDIT FOR MAKING THE PAYMENT.

FAILURE OF A PARTY TO PAY CHILD SUPPORT DOES NOT JUSTIFY DENYING THAT PARTY COURT-ORDERED POSSESSION OF OR ACCESS TO A CHILD. REFUSAL BY A PARTY TO ALLOW POSSESSION OF OR ACCESS TO A CHILD DOES NOT JUSTIFY FAILURE TO PAY COURT-ORDERED CHILD SUPPORT TO THAT PARTY.

### Costs

IT IS ORDERED that costs of court are to be borne by the party who incurred them

### Tax Exemption

It is ordered that HELEN JONES shall claim the tax exemption of the children each year.

### Discharge from Discovery Retention Requirement

IT IS ORDERED that the parties and their respective attorneys are discharged from the requirement of keeping and storing the documents produced in this case in accordance with rule 191.4(d) of the Texas Rules of Civil Procedure.

IT IS ORDERED that any persons required to serve discovery materials shall maintain, for a period of [number] months after this order is signed, the originals or exact copies of all discovery materials produced during the pendency of this matter and not filed with the Court. If an appeal is begun within that [number]-month period, IT IS FURTHER ORDERED that the discovery materials shall be maintained while the appeal is pending.

*Relief Not Granted*

IT IS ORDERED that all relief requested in this case and not expressly granted is denied.

*Date of Order*

This order judicially PRONOUNCED AND RENDERED in court at Edinburg, Hidalgo County, Texas, on December 49, 2014 and further noted on the court's docket sheet on the same date, but signed on 1/28/2015 , 2015.

_____
JUDGE PRESIDING

APPROVED AS TO FORM ONLY:

_____
Roel "Roble" Flores
robleflorelaw@att.net

_____
Francisco Guerrero
fg@pgglex.com

APPROVED AS TO FORM *ONLY*

_____
HELEN JONES

_____
BLANCA ESTELA JONES

Electronically Filed
1/9/2015 12:39:23 PM
Hidalgo County District Clerks
Reviewed By: Virginia Granados

CAUSE NO: F-3928-14-D

| IN THE INTEREST OF | § | IN THE JUDICIAL DISTRICT |
| | § | |
| LARRY D. JONES III, | § | |
| ALEXANDRA Y. JONES, | § | |
| WILLIAM F. JONES AND | § | 206ᵗʰ DISTRICT COURT |
| CATHERINE JONES | § | |
| | § | |
| MINOR CHILDREN | § | HIDALGO COUNTY, TEXAS |

## Findings of Fact and Conclusions of Law

TO THE HONORABLE JUDGE OF SAID COURT:

In response to the oral request of **BLANCA JONES**, the Court makes and files the following as original Findings of Fact and Conclusions of Law in accordance with rules 296 and 297 of the Texas Rules of Civil Procedure.

### Findings of Fact - Conservatorship

1. At the time of the filing of this suit, **HELEN JONES** is the paternal grandmother of the children, and **BLANCA JONES** is the mother of the children. The father of the children is deceased and died on or about **July 11, 2014.**

2. It is in the best interest of the children that **HELEN JONES** be appointed the sole managing conservator of the children and that **BLANCA JONES** be appointed the possessory conservator of the children.

3. The court finds that **HELEN JONES**, grandparent had standing to bring this suit and the parties agreed that she had standing.

4. There is credible evidence that the children were voluntarily relinquished and the appointment of **BLANCA JONES**, parent would significantly impair the children's physical health or emotional development.

5. The court finds pursuant to section 153.131 and 153.373 that the presumption that a parent should be appointed or retained as managing conservator of the children is rebutted since the court finds the appointment of the parent would significantly impair the child's

1

108

physical health or emotional development. In addition, the Court finds that the parent voluntarily relinquished the actual care, control and possession of the children to the paternal grandparent, **HELEN JONES**, for a period of six months or more. In addition, the Court finds it is in the children's best interest that **HELEN JONES** be appointed as the sole managing conservator.

## Findings of Fact- Possession & Child Support

6. The periods of possession comply with the Standard Visitation Order.

7. The court finds that child support and medical support is based on minimum wage.

## *Conclusions of Law-Conservatorship*

It is in the best interest of the children that **HELEN JONES** should be appointed the sole managing conservator of the children and that **BLANCA JONES** be appointed the possessory conservator of the children.

## *Conclusion of Law - Possession*

**BLANCA JONES** is entitled to periods of possession with the children pursuant to the Standard Possession Order.

## *Findings of Fact as Conclusions of Law*

Any finding of fact that is a conclusion of law shall be deemed a conclusion of law.

1/12/2015
SIGNED on January _____, 2015.

_____
JUDGE PRESIDING

Mr. Francisco Guererro
Email fg@pgglex.com

Roel "Robie" Flores
Email robiefloreslaw@att.net

2

109

**297 S.W.3d 464**
**Shelley Durrell Haines CRITZ and Roger Allen Critz, Appellant/Cross-Appellant,**
**v.**
**Roger Allen CRITZ, Joseph C. Critz, and Sharon A. Critz and Shelley Durrell Haines Critz,**
**Appellees/Cross-Appellee.**
**No. 2-08-015-CV.**
**Court of Appeals of Texas, Fort Worth.**
**September 17, 2009.**
**[297 S.W.3d 467]**
**Jacquelyn A. Flynt, Monique Lopez-Hinkley, Leagl Aid of Northwest Texas, Fort Worth, TX,**
**for Shelley Durrell Haines Critz.**
**Jeremy C. Martin, Dallas, TX, for Roger C. Critz.**
**Georganna L. Simpson, Law Offices of Georganna L. Simpson, Dallas, TX, Sarraine S.**
**Krause, Law Office of Sarraine S. Krause, Fort Worth, TX, for Joseph C. Critz, Sharon A. Critz.**
**Panel: CAYCE, C.J.; LIVINGSTON and GARDNER, JJ.**
**OPINION**
**JOHN CAYCE, Chief Justice.**

Appellant Shelley Durrell Haines Critz complains of the trial court's final decree of divorce appointing appellees Joseph C. Critz and Sharon A. Critz as joint managing conservators of Ryder Critz. We reverse and remand.

**I. Background**

Roger and Shelley Critz met while they were both working at a nightclub in the early 1990s. In February 1998, Shelley gave birth to their only child, Ryder, and in September of that year, Shelley and Roger married.

In February 2003, after an argument about Roger's alleged drug use, Roger moved out of their house. Shelley remained in the house with Ryder for another six months before she learned that it was being foreclosed.

Both Shelley and Ryder eventually moved in with Roger's parents, Joseph and Sharon Critz (the Grandparents). While Shelley and Ryder were living with the Grandparents, Shelley met and began dating Chris Martinez. In January of 2004, she began staying with Chris and away from the Grandparents' house on weekends. In May 2004, Shelley became pregnant with Chris's child.

In June 2004, Shelley moved in with Chris and his parents while Ryder continued to stay with his Grandparents. During much of the remainder of 2004, Shelley was hospitalized due to complications from her pregnancy. She saw Ryder one day in September, two days in October, no days in November, and three days in December. She also kept in contact with him by phone. During Christmas, she drove to the Grandparents' house to see Ryder but she became sick on the return trip and miscarried.

On January 27, 2005, Roger filed an original petition for divorce requesting that he be appointed primary joint managing conservator of Ryder. The same day, the Grandparents filed a petition intervening into the divorce suit seeking primary joint managing conservatorship on the grounds that Roger and Shelley had voluntarily abandoned Ryder, and that appointing Roger or Shelley as a primary conservator would significantly impair Ryder's physical health or emotional development.

Shelley filed answers to the petitions, along with a counterpetition for divorce

[297 S.W.3d 468]

requesting that she be appointed sole managing conservator, and contending that appointment of the Grandparents or Roger as joint managing conservators would not be in Ryder's best interests.



On May 12, 2005, the trial court issued temporary orders that gave the Grandparents primary custody of Ryder, and delineated specific times when Shelley and Roger had rights to possession.

In November 2006, Todd Maslow, a caseworker for Family Court Services, submitted a social study report recommending that Ryder should continue to reside with the Grandparents, but that he should continue to see Shelley as much as possible.

In March 2007, the Grandparents filed a "parenting plan" for Ryder, which intended to "establish guidelines," "state the importance of [Ryder's] well being," and "establish goals for emotional support, education, and discipline." The parenting plan described their intentions for Ryder's education (including plans related to his ADHD),[1] his after-school care, his medical needs (including a list of health care providers he would use), and Roger's and Shelley's proposed roles. The plan proposed that they, Shelley, and Roger all be appointed as joint managing conservators, that the Grandparents should establish his primary residence, and that Shelley and Roger should have designated times of possession, including times during the summer and on holidays.

The issues regarding Ryder's custody were tried before the trial court in March 2007. After the parties rested and counsel made closing arguments, on March 30, 2007, the trial court appointed the Grandparents, Shelley, and Roger as joint managing conservators of Ryder, with the Grandparents having primary possession and the authority to establish his permanent residence. The trial court set particular dates and times for Shelley to have access to Ryder, but stated that Roger would have such access only "at such times as is agreed upon" between him and his parents. In October 2007, the trial judge signed a final decree of divorce that incorporated these decisions.[2]

In November 2007, Shelley filed a motion for new trial, asserting that the evidence presented at trial was legally and factually insufficient to support the trial court's conservatorship decision, and she requested the court to issue findings of fact and conclusions of law related to its decree.[3] The Grandparents responded to the motion for new trial and submitted proposed findings of fact and conclusions of law, which the trial court adopted. In the court's findings of fact, the court found that the Grandparents "rebutted the parental presumption" and that it was in Ryder's best interest that the Grandparents, Shelley, and Roger be appointed joint managing conservators. This appeal and cross-appeal followed.

## II. Issues on Appeal

Shelley complains of the trial court's order appointing the Grandparents as joint managing conservators of Ryder. She contends that the trial court erred in failing to make specific findings of fact identifying the basis for its conclusion that the

[297 S.W.3d 469]

parental presumption was rebutted by the Grandparents. She further contends that the evidence is legally and factually insufficient to prove that she relinquished control of Ryder for more than one year and that she would significantly impair Ryder's physical or emotional well-being. Roger complains of the trial court's failure to specify his periods of possession and access.

### A. Standard of Review

A trial court's decision regarding the conservatorship of a child is reviewed under an abuse of discretion standard.[4] To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable.[5] Merely because a trial court may decide a matter within its discretion in a different manner than an appellate court would in a similar circumstance does not



demonstrate that an abuse of discretion has occurred.[6]

An abuse of discretion does not occur where the trial court bases its decision on conflicting evidence.[7] Furthermore, an abuse of discretion does not occur as long as some evidence of substantive and probative character exists to support the trial court's decision.[8]

**B. The Parental Presumption**

In her first issue, Shelley contends that the trial court abused its discretion when it appointed the Grandparents as joint managing conservators of Ryder without making specific findings related to the parental presumption described by sections 153.131 and 153.373 of the family code.[9] Section 153.131 provides:

> (a) Subject to the prohibition in Section 153.004,[10] unless the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development, a parent shall be appointed sole managing conservator or both parents shall be appointed as joint managing conservators of the child.
>
> (b) It is a rebuttable presumption that the appointment of the parents of a child as joint managing conservators is in the best interest of the child. A finding of a history of family violence involving the parents of a child removes the presumption

[297 S.W.3d 470]

> under this subsection.[11]

Section 153.373 states that

[t]he presumption that a parent should be appointed or retained as managing conservator of the child is rebutted if the court finds that:

> (1) the parent has voluntarily relinquished actual care, control, and possession of the child to a nonparent, licensed child-placing agency, or authorized agency for a period of one year or more, a portion of which was within 90 days preceding the date of intervention in or filing of the suit; and
>
> (2) the appointment of the nonparent or agency as managing conservator is in the best interest of the child.[12]

Collectively, these statutes provide that it is presumed that the appointment of "the parents of a child" as joint managing conservators is in the best interest of the child.[13] To overcome this presumption, a court must find that (1) appointment of the parents would significantly impair the child's physical health or emotional development, (2) the parents have exhibited a history of family violence, or (3) the parents voluntarily relinquished care, control, and possession of the child to a non-parent for a year or more.[14] A trial court's conclusion that the parental presumption has been rebutted must be supported by specific findings of fact identifying the factual basis for the finding, and the failure to make such findings constitutes error.[15]

Shelley contends that the trial court was required to specifically make one of these three findings to appoint the Grandparents as joint managing conservators. Relying on a Texas Supreme Court opinion construing a former version of the family code, the Grandparents assert that the presumption does not apply and, therefore, no findings were required because Shelley and Roger were also made joint managing conservators.



In *Brook v. Brook,*[16] the supreme court construed former family code section 14.01, which provided, in pertinent part, as follows:

> (a) In any suit affecting the parent-child relationship, the court may appoint a sole managing conservator or may appoint joint managing conservators. A managing conservator must be a suitable, competent adult, or a parent, or an authorized agency. If the court finds that the parents are or will be separated, the court shall appoint at least one managing conservator.
>
> (b) A parent shall be appointed sole managing conservator or both parents shall be appointed as joint managing conservators of the child unless:
>
> (1) the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development.[17]

[297 S.W.3d 471]

The supreme court held that section 14.01 authorized a trial court to appoint a non-parent as a joint managing conservator without proof that appointment of a parent or the parents would significantly impair the child's health or development, so long as the non-parent shares custody with a parent.[18]

Unlike current section 153.131, former section 14.01 contained no rebuttable presumption that appointment of both parents as joint managing conservators is in the child's best interest.[19] At the time *Brook* was decided, a trial court was authorized to appoint parents as joint managing conservators only upon finding that

the appointment would be in the child's best interest.[20] This is no longer the law.[21]

Under current section 153.131, it is now presumed that the appointment of *both* parents as joint managing conservators is in the child's best interest.[22] This substantive change in the parental presumption law is not addressed by the dissent. When *Brook* was decided, there was no rebuttable presumption that *both* parents be appointed joint managing conservators. Thus, under former law, so long as one parent was appointed a joint managing conservator, as was the case in *Brook,* the parental presumption was satisfied. Under section 153.131, however, a non-parent may not be appointed a joint managing conservator without overcoming the presumption as to *both* parents.[23] The plain wording of the statute makes clear that this presumption applies when a non-parent seeks managing conservatorship in lieu of or in addition to both parents. There is no language in section 153.131 that indicates that the presumption is inapplicable to the appointment of non-parents as joint managing conservators when the trial court also appoints one or both parents. Nor does *Brook* compel this result.

[297 S.W.3d 472]

The dissent suggests that we have departed from binding precedent of the supreme court and of this court. We clearly have not. *Brook,* and this court's nearly twenty-year-old decision following it,[24] interpreted and applied a former statute that did not contain a parental presumption requiring that both parents be appointed joint managing conservators unless rebutted. Because *Brook* construed a repealed statute that is substantively different than the statute at issue here, we are, of course, not bound under the doctrine of stare decisis by the *Brook* court's interpretation of the repealed statute.[25]

The dissent takes the novel position that the presumption does not apply to the appointment of the joint managing conservators in this case, but that it does apply to which joint managing conservator should determine the child's



permanent residence. As written by the legislature, however, section 153.131 contains no language that indicates a legislative intent that a parental presumption applies to the issue of primary custody *apart from* the determination of joint managing conservatorship. The title to section 153.131 is "Presumption That Parent to be Appointed *Managing Conservator.*"[26] Moreover, the statute expressly refers to a presumption that a parent should be appointed "sole managing conservator," or that both parents should be appointed "joint managing conservators"—it makes no reference to a separate presumption for determining which joint managing conservator chooses the child's permanent residence.[27] To reach the result that the dissent advocates, we would be required to legislate from the bench and convert the managing conservator presumption into a "primary custody" presumption with no statutory authority for doing so. We are not inclined to do this.[28]

We hold that the trial court correctly followed express provisions of the family code by applying the parental presumption to the appointment of the Grandparents as joint managing conservators in this case. Upon finding that the parental presumption was rebutted, however, the trial court failed to make findings specifically stating how the presumption was rebutted.[29] The failure to make such findings is error.[30] This error was waived, however, because Shelley did not timely request additional findings of fact.[31] Shelley's first issue is overruled.

[297 S.W.3d 473]

### C. The Sufficiency of the Evidence to Overcome the Parental Presumption

We now turn to Shelley's contention in her second issue that insufficient evidence was presented by the Grandparents to rebut the presumption through either voluntary relinquishment or significant impairment grounds.[32]

### 1. Standards of Review

In an abuse of discretion review, legal and factual insufficiency are not independent grounds for asserting error, but are merely relevant factors in assessing whether a trial court abused its discretion.[33] Thus, in applying the abuse of discretion standard, an appellate court in a family law case must apply a two-prong analysis: (1) whether the trial court had sufficient evidence upon which to exercise its discretion; and (2) whether the trial court erred in applying its discretion.[34]

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact.[35] In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not.[36]

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered.[37]

### 2. Voluntary Relinquishment of Ryder for a Period of One Year or More

The Grandparents contend that Shelley's sparse contact with Ryder from January 2004 to January 2005 proves that she voluntarily relinquished actual care, control, and possession of Ryder to them. We disagree.

Between January and April of 2004, Shelley maintained her permanent residence



with Ryder and saw him on a majority of days. While she was absent from Ryder on several occasions during that time period, there is no evidence that she intended to surrender the care of Ryder.

[297 S.W.3d 474]

After Shelley moved out of the Grandparents' residence in June 2004, the time she spent with Ryder decreased.[38] But, the testimony of both Shelley and Sharon shows that, although Shelley was often physically separated from Ryder in the latter part of 2004, she did not intend to relinquish control of him.

Shelley testified that she had agreed with the Grandparents that Ryder would stay with them long enough to complete his school year, and that she would change Ryder's school and have him live with her the following year. Shelley stated that she talked with the Grandparents about this plan "[w]eekly from the moment that [she] didn't stay at their house" and that she was "made to believe" that the change was going to happen. Sharon testified that she was aware of these plans when Shelley moved out of her house, and that she knew that Shelley's intention was to take Ryder back. She also admitted that even when Shelley moved away, she was "still involved in decisions regarding Ryder" and, most importantly, that Shelley "never actually, really relinquished ... control completely."

Thus, while Shelley may have been physically apart from Ryder for a substantial part of 2004, there is no evidence that she voluntarily relinquished actual care, custody, and control of him to the Grandparents.[39]

**3. Significant Impairment of Ryder's Physical Health or Emotional Development**

Shelley also contends that the evidence is legally and factually insufficient to establish that appointing her and Roger as joint managing conservators would significantly impair Ryder's physical health or emotional development.[40] Although there is some evidence to support a

finding of significant impairment, we agree with Shelley that the evidence is factually insufficient to support such a finding.

Impairment must be proved by a preponderance of the evidence indicating that some specific, identifiable behavior or conduct of the parent, demonstrated by specific acts or omissions of the parent, will probably cause that harm.[41] This is a heavy burden that is not satisfied by merely

[297 S.W.3d 475]

showing that the non-parent would be a better custodian of the child.[42] "Close calls" should be decided in favor of the parent.[43]

Evidence of past misconduct is not alone sufficient to show present unfitness.[44] "If the parent is presently a suitable person to have custody, the fact that there was a time in the past when the parent would not have been a proper person to have such custody is not controlling."[45]

The evidence offered at trial was as follows:

Diane Booth, a licensed social worker who conducted another study in 2006 after Maslow issued his report, testified that Joseph and Sharon were "great grandparents" and that Shelley was a good mom who never put Ryder in any danger and was generally doing a good job parenting him. She also reported that Roger had drug addiction problems, that he described himself as a "practicing alcoholic," and that he seemed to be angry over the fact that he had been adopted, but that he had steady work and that he "loved being around Ryder." She further explained that when she met with Ryder, he was happy, but he was also confused about his living situation regarding the various people who had requested custody of him. She also testified that she received a letter from Ryder stating that he wanted to live with Shelley.

Booth recommended that Ryder be placed with Shelley and opined that it would be in Ryder's best interest if the Grandparents fulfilled



a secondary role in a more typical grandparent relationship with Ryder.

Barbara Martinez, Chris's mother, testified that Shelley was a good mother who took good care of Ryder when he was at her house. According to Mrs. Martinez, Shelley bathed Ryder, did his laundry, disciplined him, and helped him with his homework. Kyra Anderson, Ryder's first grade teacher during 2004 and 2005, testified that the Grandparents were very involved in his school activities and in the progress Ryder was making in the classroom, that Ryder "fully enjoyed being with" them, and that Shelley was not involved with his schooling.[46]

Dee Henderson, who had custody of Shelley's daughter Lexi, testified that she had concerns about Shelley's ability as a parent because Shelley was unreliable and had only limited contact with Lexi.[47] She also testified, however, that she had no concerns that Lexi would be physically harmed while with Shelley, that she had no concerns about Lexi's safety at the Martinezes' house, and that she had never seen Shelley be physically or verbally abusive to Lexi or Ryder.

Cathy Baczynski, a licensed professional counselor, testified that, during counseling, Roger discussed identity issues related to

[297 S.W.3d 476]

his adoption as well as his substance abuse history, his need to overcome his ADHD, his frustration about living with his parents, and his lack of communication with Shelley. Baczynski also explained that she met with Ryder and gained the impression from him that Roger needed to be much more involved in Ryder's life. She also stated that Ryder seemed to be happy living with his Grandparents and that his needs were well met in their home, but that he would like to spend more time with Shelley and that, as a general rule, it is always best for a child's parents to have custody if possible. She concluded that Roger has made positive strides,

but he does not have the ability to be Ryder's primary managing conservator.

Roger testified that he resided with his parents for three years preceding the trial, that he was currently employed in the information technology field, and that he had previously been employed as a bartender at several locations. He stated that two years had passed from the last time he used illegal drugs and that he drank alcohol about once a week at the time of trial, becoming drunk occasionally. He expressed a desire to be a good father and also gave his opinion that Ryder should continue to reside with the Grandparents because he felt Ryder needed more "structure and support," but that Shelley should have equal time with Ryder and that she "loves [Ryder] very much." However, Roger also testified that in January 2005 Shelley threatened to take Ryder away so that he and the Grandparents would never see Ryder again.[48] He further said that when he first separated from Shelley he was concerned for Ryder's safety because he believed Shelley did not take care of Ryder's physical needs.

Sharon testified that she and Joseph first began to keep Ryder at their home every other weekend when he was born, and then they progressed to keeping him every weekend and part of the summer before Shelley and Ryder moved in with them in 2003. She also contended that Shelley was not very involved in Ryder's early education and that she often returned Ryder late from her Wednesday visits with him. Sharon explained that upon picking up Ryder from one of his visits to the Martinezes' house, she became concerned about broken glass surrounding a trampoline, a murky swimming pool, and an open flame on the stove, which Shelley stated was used for heating. She was also concerned that Shelley had taken Ryder to the nightclub during a poker tournament that was hosted there.

Sharon said that she saw Shelley slap Ryder one time, that Shelley told her that she spanks Ryder, and that after returning from visits with Shelley, Ryder had behavioral problems. She conceded, however, that Ryder missed Shelley



and that he and Shelley loved each other. She requested that the court allow her and Joseph to keep Ryder during school weeks and split the rest of Ryder's access equally between Roger and Shelley.

Joseph testified that he was concerned that Shelley could not provide a stable financial environment for Ryder because she did not have a paying job, did not have a car in her name, and did not have her own place to live. Joseph described that Roger had taken a more active role in Ryder's life, had obtained a respectable job, had provided health insurance for Ryder, and had sought help from a therapist to deal with Roger's emotional problems.

Todd Maslow (who submitted the original social study report) testified that, despite his recommendation that Ryder

[297 S.W.3d 477]

should remain with his Grandparents, he would not have concerns about Ryder's safety if he stayed with Shelley and did not believe that Ryder living with Shelley would significantly impair Ryder's physical health or emotional development.[49] He also testified that when he talked to Ryder when completing his initial study, Ryder told him he wanted to live with Shelley.

The Grandparents also rely on evidence of Shelley's history of drug use and her living and financial conditions as proof that Ryder's physical and emotional health would be impaired by the appointment of Shelley and Roger as joint managing conservators. At the time of trial, however, Shelley was not taking any medications. While she admitted that she had previously been dependent on drugs prescribed for her multiple sclerosis,[50] and evidence established that she had taken high dosages of several types of prescription medications that sometimes negatively affected her,[51] she testified that at the time of trial, she was not taking any prescription medications, she had no current symptoms from her multiple sclerosis, and she only had one prescription—for

Xanax—filled within the previous six months. No evidence was presented indicating that Shelley was still taking high dosages of prescription medications at the time of or recently before trial; in fact, a "prescription profile" exhibit submitted into evidence by the Grandparents listed no prescriptions for Shelley after 2005. Thus, while Shelley's drug use may have affected her fitness as a mother in the past, there was no evidence presented of any current drug use that would cause significant impairment to Ryder's physical health or emotional development in the present.

With regard to Shelley's living and financial conditions, the evidence shows that, at the time of trial, Shelley and Chris, who also has a history of drug abuse, were living together at his parents' home. Chris, however, offered uncontroverted testimony that he had not used illegal drugs in at least the four years preceding trial. Also, the evidence established that at the Martinezes' five bedroom, two story house, Ryder had his own room and that Shelley's work at the nightclub on weekends could allow her to be a stay-at-home mom for Ryder during weekdays.[52] Shelley's residence at the Martinezes' house seemed to be stable. Mrs. Martinez testified that Shelley had become like a daughter

[297 S.W.3d 478]

to her and that if Chris's and her relationship became estranged, Shelley could continue to live at her house with Ryder. Although, as the Grandparents point out, Shelley does not own or lease a vehicle, carry health insurance, or maintain paid employment, Mrs. Martinez testified that Shelley has access to four vehicles at her house and that she is "free to take them anytime," Roger carries insurance for Ryder, and Shelley's lack of paid employment is "no evidence" of a potential for significant impairment to Ryder.[53]

Finally, the Grandparents cite evidence in the record related to certain conditions at the Martinezes' house that they believe could cause harm to Ryder. For example, they note that the



Martinezes' backyard had a murky pool that was filled with leaves and a trampoline that had broken glass underneath it. Mrs. Martinez, on the other hand, testified that Ryder was never allowed unattended outside, that an alarm sounded if any door in the house was opened, and that if the trial judge was concerned about the safety of the pool, she would remedy those concerns. Sharon testified that she had learned that the broken glass was from a patio table that had blown into the pool during a windstorm; there was no evidence in the record as to how recently the windstorm had occurred. Sharon was also concerned at trial about an open flame used to heat the Martinezes' house, but she admitted that Ryder had been taught about fire hazards and that he was unlikely to attempt to play with the flame.

Viewing the entire record under the legal and factual sufficiency standards of review articulated above, we conclude that, while there is some evidence that placing Ryder under the joint managing conservatorship of Shelley and Roger might significantly impair the physical health and emotional development of Ryder, the evidence is factually insufficient to support a finding of such impairment.

## III. Conclusion

We hold that the trial court abused its discretion by appointing the Grandparents as joint managing conservators because the evidence is insufficient to support the trial court's finding that the parental presumption was rebutted. There is no evidence that Shelley voluntarily relinquished actual care, custody, and control of Ryder for one year or more, and the evidence is factually insufficient to prove that the appointment of Ryder's parents as joint managing conservators would significantly impair Ryder's physical health or emotional development. We, therefore, reverse the provisions of the decree pertaining to joint managing conservatorship, render judgment that a non-parent shall not be appointed joint managing conservator based on Shelley's alleged voluntary relinquishment of Ryder's care, custody, and control for the period between January 2004 and January 2005, and remand the case for a new trial on the issue of whether the appointment of Shelley and Roger as joint managing conservators would not be in the best interest of Ryder because such an appointment would significantly impair his physical health or emotional development.[54]

LIVINGSTON, J., filed a dissenting and concurring opinion.

---------------

Notes:

1. Ryder was diagnosed with ADHD while in the second grade.

2. Specifically, the decree granted Shelley possession of Ryder on three weekends per month, Thursday evenings, spring breaks, some of the time during Ryder's Christmas break, Mother's Day, some other holidays, and forty-two days during the summer, but gave possession to the Grandparents at "all other times not specifically designated."

3. *See* Tex.R. Civ. P. 296.

4. *See In re M.P.B.,* 257 S.W.3d 804, 811 (Tex. App.-Dallas 2008, no pet.); *Earvin v. Dep't of Family & Protective Servs.,* 229 S.W.3d 345, 350 (Tex.App.-Houston [1st Dist.] 2007, no pet.).

5. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241-42 (Tex. 1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986).

6. *Id.*

7. *In re Barber,* 982 S.W.2d 364, 366 (Tex. 1998) (orig. proceeding).

8. *See Butnaru v. Ford Motor Co.,* 84 S.W.3d 198, 211 (Tex.2002).

9. Tex. Fam.Code Ann. §§ 153.131, .373 (Vernon 2008).

10. Section 153.004 states, in part, that in determining conservatorship, a court shall consider evidence of the intentional use of abusive physical force and that a court may not "appoint joint managing conservators if credible evidence is presented of a history or pattern of past or present child neglect, or physical or sexual abuse by one



parent directed against the other parent, a spouse, or a child ... that results in the other parent becoming pregnant with the child." Tex. Fam. Code Ann. § 153.004(a)-(b) (Vernon 2008); *see In re R.T.H.,* 175 S.W.3d 519, 521 (Tex. App.-Fort Worth 2005, no pet.).

11. Tex. Fam.Code Ann. § 153.131.

12. *Id.* § 153.373.

13. *Id.* §§ 153.131(a),(b), .373.

14. *Id.* §§ 153.131(a),(b), .373; *see In re N.J.G.,* 980 S.W.2d 764, 766 n. 1 (Tex.App.-San Antonio 1998, no pet.).

15. *Chavez v. Chavez,* 148 S.W.3d 449, 459-60 (Tex.App.-El Paso 2004, no pet.); *see* Tex. Fam.Code Ann. §§ 153.004, .131, .373.

16. 881 S.W.2d 297 (Tex. 1994).

17. Act of May 29, 1993, 73rd Leg., R.S., ch. 766, § 1, sec. 14.01(a), 1993 Tex. Gen. Laws 2989, 2989, *repealed by* Act of April 6, 1995, 74th Leg., R.S., ch. 20, § 2, 1995 Tex. Gen. Laws 282, 282; Act of May 28, 1989, 71st Leg., R.S., ch. 370, § 1, sec. 14.01(b)(1), 1989 Tex. Gen. Laws 1461, 1461, *repealed by* Act of April 6, 1995, 74th Leg., R.S., ch. 20, § 2, 1995 Tex. Gen. Laws 282, 282.

18. *Brook,* 881 S.W.2d at 300.

19. *See* Tex. Fam.Code Ann. § 153.131(b), Historical and Statutory Notes ("Acts 1995, 74th Leg., ch. 751 ... added subsec. (b)," which provides for "rebuttable presumption that the appointment of the parents of a child as joint managing conservators is in the best interest of the child").

20. *See* Act of May 14, 1991, 72nd Leg., R.S., ch. 161, § 2, 1991 Tex. Gen. Laws 771, 771, *repealed by* Act of April 6, 1995, 74th Leg., R.S., ch. 20, § 2, 1995 Tex. Gen. Laws 282, 282; *see also Brook,* 881 S.W.2d at 298.

21. While we have found no legislative history beyond the changes made to the current statute after section 14.01 was repealed that expressly indicates that the legislature intended to overrule or nullify *Brook* when it repealed section 14.01, it is clear from a comparison of the two statutes that the post-*Brook* changes to the statutes were substantive.

22. *See* Tex. Fam.Code Ann. § 153.131(a) ("*both parents* shall be appointed as joint managing conservators of the child") (emphasis added), § 153.131(b) ("It is a rebuttable presumption that the appointment of *the parents* of a child as joint managing conservators is in the best interest of the child.") (emphasis added).

23. *See* Tex. Fam.Code Ann. § 153.131(a) ("*both parents* shall be appointed as joint managing conservators of the child") (emphasis added), § 153.131(b) ("It is a rebuttable presumption that the appointment of *the parents* of a child as joint managing conservators is in the best interest of the child.") (emphasis added). The dissent contends that the presumption does not apply to the grandparents because both parents were appointed as joint managing conservators. But section 153.131 clearly requires that the presumption favoring the appointment of both parents as joint managing conservators be rebutted by any non-parent seeking a joint managing conservatorship appointment in lieu of or in addition to both parents.

24. *See Connors v. Connors,* 796 S.W.2d 233, 239 (Tex.App.Fort Worth 1990, writ denied).

25. *See Lal v. Harris Methodist Fort Worth,* 230 S.W.3d 468, 473-74 (Tex.App.-Fort Worth 2007, no pet.) (rejecting argument that statute that was substantively amended should be construed as if it had not been amended).

26. Tex. Fam.Code Ann. § 153.131 (emphasis added).

27. *Id.*

28. Moreover, the two El Paso Court of Appeals opinions on which the dissent relies actually support the conclusion that the parental presumption only applies to primary custody in the context of determining joint managing conservatorship between a parent and non-parent. *See Sotelo v. Gonzales,* 170 S.W.3d 783, 788 (Tex.App.El Paso 2005, no pet.); *In re De La Pena,* 999 S.W.2d 521, 534-35 (Tex.App.El Paso 1999, no pet.).

29. The trial court also offered no explanation for why he appointed Shelley and Roger joint managing conservators of Ryder after concluding that the presumption was rebutted, i.e., that it would not be in Ryder's best interest to appoint his parents as joint managing conservators.



30. *Chavez,* 148 S.W.3d at 459-60.

31. Tex.R. Civ. P. 297, 299; *Chavez,* 148 S.W.3d at 459-60.

32. Joseph and Sharon have not contended on appeal that the evidence supported a finding that Shelley exhibited a history of family violence, so we will not analyze this ground for rebutting the parental presumption. *See* Tex. Fam.Code Ann. § 153.131(b).

33. *M.P.B.,* 257 S.W.3d at 811-12; *In re M.C.F.,* 121 S.W.3d 891, 895, 899 (Tex.App.-Fort Worth 2003, no pet.).

34. *M.C.F.,* 121 S.W.3d at 895.

35. *Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied,* 526 U.S. 1040, 119 S.Ct. 1336, 143 L.Ed.2d 500 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 Tex. L. Rev. 361, 362-63 (1960).

36. *Cent. Ready Mix Concrete Co. v. Islas,* 228 S.W.3d 649, 651 (Tex.2007); *City of Keller v. Wilson,* 168 S.W.3d 802, 807, 827 (Tex.2005).

37. *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex. 1965); *In re King's Estate,* 150 Tex. 662, 664-65, 244 S.W.2d 660, 661 (1951).

38. According to Sharon's calendar, Shelley saw Ryder only twenty times from June through December 2004.

39. Even if we were to conclude that some evidence of relinquishment existed beginning in June 2004, when Shelley moved out of the Grandparents' home, she filed answers to Roger's petition and the Grandparent's petition in intervention in February 2005 and, therefore, ended any period of voluntary relinquishment approximately seven months after leaving the Grandparents' house to leave Ryder with his grandparents. *See In re S.W.H.,* 72 S.W.3d 772, 777 (Tex.App.Fort Worth 2002, no pet.). Moreover, in May 2005, the trial court entered a temporary order restricting Shelley's access to Ryder. In light of such an order, any relinquishment by Shelley that occurred while the order was in effect was involuntary. *Id.* (concluding that a temporary restraining order entered against a parent ended the parent's period of voluntary relinquishment); *see also In re M.W.,* 959 S.W.2d 661, 668 (Tex.App.-Tyler

1997, writ denied) (suggesting that voluntary relinquishment ends when temporary restrictions are ordered).

40. *See* Tex. Fam.Code Ann. § 153.131(a); *Sotelo,* 170 S.W.3d at 788.

41. *Lewelling v. Lewelling,* 796 S.W.2d 164, 167 (Tex. 1990); *Whitworth v. Whitworth,* 222 S.W.3d 616, 623 (Tex.App.-Houston [1st Dist.] 2007, no pet.) (stating that the "link between the parent's conduct and harm to the child may not be based on evidence which merely raises a surmise or speculation"); *see* Tex. Fam.Code Ann. § 105.005 (Vernon 2008) (stating that findings in family law cases must generally be proved by the preponderance standard).

42. *Lewelling,* 796 S.W.2d at 167.

43. *Id.* at 168.

44. *Id.*

45. *May v. May,* 829 S.W.2d 373, 377 (Tex. App.-Corpus Christi 1992, writ denied) (op. on reh'g); *see S.W.H.,* 72 S.W.3d at 777-78 (holding that the mother's past severe drug addiction and past incarcerations related to drug use did not create a present likelihood of significant impairment to her child).

46. At trial, Shelley testified that she visited Ryder's school two days a week and that she went to his school-related activities.

47. Shelley has had six pregnancies. Among these, she had a daughter in 1994 named Lexi whom she lived with for only six months and shared access to at the time of trial, and she also had a baby with Chris after her miscarriage, who was six months old when the trial began.

48. Sharon's testimony confirmed the threat.

49. Specifically, Maslow stated that the move to live with Shelley "could affect [Ryder's] emotional adjustment; but seriously impair, no." He did, however, testify that he believed the Grandparents and Roger were providing Ryder with security in his current placement, that Ryder should remain with them, and that he retained some concerns about some of Shelley's circumstances and her truthfulness on some of the responses she gave to him in his initial survey.



50. Shelley had taken many prescription medications, including Suboxone, Seroquel, Hydrocodone, Ambien, Lunesta, Lamictal, and Xanax at various times before trial. These medications sometimes made her dizzy or drowsy with slurred speech. Sharon testified that in 2003, Shelley often left medication out in places that Ryder had access to, and that in 2005, during one of Shelley's scheduled visits with Ryder, the medication caused Shelley to sleep for a prolonged period on Ryder's bedroom floor.

51. A pharmacist called by Roger's attorney described the medications Shelley had taken and opined that the dosages were high, but admitted that she had limited knowledge of multiple sclerosis and the reasons why Shelley's doctors may have been prescribing the types and amounts of medication she was taking.

52. Shelley helped manage a nightclub that she, Chris, and Chris's parents jointly owned, although she received room and board in lieu of salary. Chris's mother watched Ryder when Shelley worked.

53. *See Lewelling,* 796 S.W.2d at 167.

54. Because we have reversed and remanded the issues related to conservatorship and possession, we need not address Roger's sole issue in which he contends that the trial court abused its discretion by rendering a custody order that, although naming him a joint managing conservator of Ryder, did not designate his periods of possession and access. *See* Tex.R.App. P. 47.1.

---------------

[297 S.W.3d 479]

TERRIE LIVINGSTON, Justice, dissenting and concurring.

The majority holds that the trial court could not appoint Joseph and Sharon (the Grandparents) together with Shelley and Roger (the Parents) as Ryder's joint managing conservators without applying the statutory parental presumption and determining that the Parents voluntarily relinquished care, custody, or control of Ryder or that the Parents' appointment as managing conservators would significantly impair Ryder's physical health or emotional development. *See* Majority op. at 470-72. The

majority departs from Texas Supreme Court precedent and our own precedent in its holding.

**The Collective Appointment of the Grandparents and the Parents as Ryder's Joint Managing Conservators**

Shelley's argument in her second issue that the trial court abused its discretion when it appointed the Grandparents as Ryder's joint managing conservators along with the Parents in that same role presupposes that the Grandparents were required to overcome the statutory parental presumption to gain the appointment. That supposition (and the majority's holding that follows the supposition) is erroneous.

Sections 153.131 and 153.373 of the family code establish that to overcome the presumption that a parent must be appointed as a managing conservator of a child, a court must find that (1) appointment of the parent would significantly impair the child's physical health or emotional development, (2) the parent has exhibited a history of family violence, or (3) the parent voluntarily relinquished care, control, and possession of the child to a nonparent for a year or more. Tex. Fam.Code Ann. §§ 153.131, .373 (Vernon 2008); *see In re N.J.G.,* 980 S.W.2d 764, 766 n. 1 (Tex.App.-San Antonio 1998, no pet.) (citing sections 153.131 and 153.373 in a discussion of the parental presumption). But these findings are not required when both parents are named managing conservators.

Section 153.372 authorizes a trial court to appoint parents and nonparents together as joint managing conservators. Tex. Fam.Code Ann. § 153.372(a) (Vernon 2008). And Texas Supreme Court precedent holds that the mere appointment of grandparents as joint managing conservators alongside parents in that same role does not require a trial court to apply the parental presumption to exclude the grandparents; rather, the trial court may make such an appointment if it deems the appointment to be in the best interest of the child. *Brook v. Brook,* 881 S.W.2d 297, 299-300 (Tex.1994).



In *Brook,* the court reviewed the collective appointment of the mother and the mother's parents as joint managing conservators to the exclusion of the father and unanimously reasoned that the statutory parental presumption "contemplates a situation in which neither of the parents are awarded" managing conservatorship. *Id.* at 298-99. The court explained that the parental presumption applies "only to those situations in which a nonparent seeks custody *in lieu of* a natural parent." *Id.* at 299 (emphasis added). Finally, the court noted that "[t]he purpose of the statute, to codify the preference for giving custody to a parent, has been met in the present case. The fact that a nonparent shares custody does not detract from the fact that one of the child's parents does have custody." *Id.* at 300. We have expressly held the same. *Connors v. Connors,* 796 S.W.2d 233, 239 (Tex.App.-Fort Worth 1990, writ denied) (holding that the presumption "does not preclude the appointment

[297 S.W.3d 480]

of a parent to serve jointly with a non-parent" and that it applies only if "appointment is to be denied to both parents").

While *Brook* cited a previous version of the family code, the language analyzed in the decision is almost exactly the same as the language that now appears in subsection (a) of section 153.131.[1] *Brook,* 881 S.W.2d at 298-99. The only addition to the presumption statute that amounts to anything beyond rearranging words is subsection (b) of section 153.131, which states that it is "a rebuttable presumption that the appointment of the parents of a child as joint managing conservators is in the best interest of the child."

The majority solely relies on subsection (b) as having precedent-overruling importance. *See* Majority op. at 470-72. But while it is possible (although not supported by any specific authority or legislative history in the majority's opinion beyond the statutory amendment itself) that subsection (b) could have modified *Brook* to the extent that the presumption applies unless both parents (rather than a single parent, like in

*Brook*) are named joint managing conservators, that possible modification would have no effect on *Brook*'s relation to this case because here the trial court *did name* both of the Parents as joint managing conservators, and thus completely complied with subsection (b). Thus, for section 153.131(b) to achieve the precedent-altering result that the majority holds it does under the facts of this case, it would need to go beyond stating that "[i]t is a rebuttable presumption that the appointment of the parents of a child as joint managing conservators is in the best interest of the child" to say something similar to "it is a rebuttable presumption that the appointment of parents of a child as joint managing conservators *to the exclusion of all other parties seeking custody* is in the best interest of the child." It does not do so.[2]

[297 S.W.3d 481]

It is "fundamental to the very structure of our appellate system that [the Texas Supreme Court's] decisions be binding on the lower courts." *Dallas Area Rapid Transit v. Amalgamated Transit Union Local No. 1338,* 273 S.W.3d 659, 666 (Tex. 2008), *cert. denied,* ___ U.S. ___, 129 S.Ct. 2767, 174 L.Ed.2d 284 (2009); *see Lubbock County v. Trammel's Lubbock Bail Bonds,* 80 S.W.3d 580, 585 (Tex.2002) (explaining that it "is not the function of a court of appeals to abrogate or modify established precedent"). Under the established precedent of the supreme court in *Brook* and of our own court in *Connors,* the Grandparents did not have to overcome the parental presumption for their appointment as joint managing conservators, and I would hold that their appointment as such is in Ryder's best interest under the factors listed in *Holley v. Adams,* 544 S.W.2d 367, 372 (Tex.1976). Thus, I would affirm the trial court's conservatorship appointment, and I dissent to the portion of the majority's opinion reversing the appointment.

**Primary Possession**

Although *Brook*'s application supports affirming the Grandparents' appointment as managing conservators along with the Parents, it



does not extend to their award of Ryder's primary possession, as challenged by Shelley. Section 153.134(b)(1) of the family code states that in rendering an order appointing joint managing conservators, a court shall designate which conservator has the exclusive right to determine the primary residence of the child. Tex. Fam.Code Ann. § 153.134(b)(1) (Vernon 2008).

In *Sotelo v. Gonzales,* the El Paso Court of Appeals decided that in an original custody determination, the parental presumption "applies when a non-parent and parent are appointed joint managing conservators of a child but the non-parent is given primary custody." 170 S.W.3d 783, 788 (Tex.App.-El Paso 2005, no pet.) (citing *In re De La Pena,* 999 S.W.2d 521, 534-35 (Tex.App.-El Paso 1999, no pet.)). The court reasoned that to "hold otherwise would permit the court to apply the presumption in appointing the parent a joint managing conservator but nevertheless choose the primary residence of the child on the basis of a heads-up best interest test, with the court determining which of the parties is the `better' choice." *Id.* This would, according to the El Paso Court, result in the "appointment of a parent as a managing conservator in name only, a paper title which eviscerates the purpose of the statute." *De La Pena,* 999 S.W.2d at 535.

In contrast, the San Antonio Court of Appeals held in *Gardner v. Gardner* that the parental presumption does not apply to the issue of primary possession between parent and nonparent joint managing conservators. 229 S.W.3d 747, 752 (Tex.App.-San Antonio 2007, no pet.). In *Gardner,* the parties agreed to joint managing conservatorship of the children at issue, and the only remaining custody issue was which joint managing conservator was going to be awarded the right to determine the primary residence. *Id.* The court reasoned that because the "plain words of [section 153.131] do not address or contemplate application of the [parental] presumption to the issue of primary possession, [it] would have to rewrite the statute

[297 S.W.3d 482]

in order to reach the result in *De La Pena.*" *Id.*

I agree with and would adopt the El Paso Court's position, applying the same reasoning as expressed in *Sotelo* and *De La Pena.* In *De La Pena,* the child's aunt sought managing conservatorship *to the exclusion of both parents in that same role. De La Pena,* 999 S.W.2d at 524-25. Because she sought complete exclusion of the parents, the El Paso Court properly applied the statutory presumption (as interpreted by *Brook*) that "the best interest of a child is served if a natural parent is appointed as a managing conservator." *Id.* at 527. Then, in applying the presumption to the primary possession issue, the El Paso Court held and explained that

> as between a parent and nonparent, unless the court finds that appointment of the parent would not be in the best interest of the child because it would significantly impair the child's physical health or emotional development, the parent shall be appointed sole managing conservator *or the parent and nonparent shall be appointed joint managing conservators. If the court chooses the latter, the parent shall be awarded primary possession unless such an order would not be in the best interest of the child because it would significantly impair the child's physical health or emotional development.*[3]

*Id.* at 534-35 (emphasis added).

Our precedent establishes that the basis of the "deeply embedded" statutory parental presumption is to protect the "natural affection usually flowing between parent and child." *In re M.N.G.,* 113 S.W.3d 27, 35 (Tex.App.-Fort Worth 2003, no pet.). Also, a parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than

any property right." *Santosky v. Kramer,* 455 U.S. 745, 758-59, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982). Implicit in these rights is the right to decide where one's child is to reside.

The majority says that applying the parental presumption to which joint managing conservator has the right to determine a child's primary residence would require us to "legislate from the bench."[4] Majority op. at 472. But the family code supports the application of the presumption even when nonparents are designated as joint managing conservators without applying the presumption under circumstances like those in *Brook.* As the El Paso Court explained, "Section 153.372(b) [of the family code] provides that the procedural and substantive standards regarding a court-ordered joint managing conservatorship provided by Subchapter C of the Family Code apply to a nonparent joint managing conservator. The very first section of Subchapter C contains the parental presumption." *De La Pena,* 999 S.W.2d at 534; *see* Tex. Fam.Code Ann. § 153.372(b) (Vernon 2008).

Other sections of the family code also support presuming that parents should

[297 S.W.3d 483]

maintain the right to designate a child's primary residence, which, as our supreme court has explained, is a crucial component of managing conservatorship. *See Phillips v. Beaber,* 995 S.W.2d 655, 660-61 (Tex. 1999) (equating the right of primary possession with "custody" and adding that primary possession and establishing a child's residence are "core rights of managing conservatorship"); *see also Troxel v. Granville,* 530 U.S. 57, 65, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49 (2000) (explaining that "the interest of parents in the care, custody, and control of their children ... is perhaps the oldest of the fundamental liberty interests"). For instance, the very first section of the conservatorship chapter of the family code relates that the state's public policy is to "assure that children will have frequent and continuing contact with parents." Tex. Fam.Code Ann. § 153.001(a)(1) (Vernon

2008). Another section of the code states that "[i]t is the policy of this state to ... optimize the development of a close and continuing relationship between each parent and child." *Id.* § 153.251(b) (Vernon 2008).

I would hold that erasing the parental presumption in an original suit on custody when a court appoints multiple parties as managing conservators but gives primary possession to a nonparent would weaken these constitutional and statutory interests and would create an unintended result by placing the parent and nonparent on equal ground for the trial court's real custody determination. Thus, because I agree with the majority that the evidence in this case is insufficient to support the trial court's finding that the Grandparents rebutted the parental presumption, I would reverse the provisions of the trial court's order pertaining to the Grandparents' right to determine Ryder's primary residence and remand this case for further proceedings related to those provisions. I would also sustain Roger's sole issue and reverse the portion of the order limiting Roger's access to and possession of Ryder because as all parties have agreed, there is no evidence in the record supporting that limitation.

**Conclusion**

For these reasons, I respectfully dissent to the portion of the majority's opinion and judgment reversing the trial court's appointment of the Grandparents and Parents together as Ryder's joint managing conservators, but I concur with the majority's remand of the case for further proceedings.

---------------

Notes:

1. Subsection (a) of section 153.131 currently provides,

> [U]nless the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly

impair the child's physical health or emotional development, a parent shall be appointed sole managing conservator or both parents shall be appointed as joint managing conservators of the child.

Tex. Fam.Code Ann. § 153.131(a). At the time of the *Brook* decision, the former section of the family code relating to the presumption stated,

A parent shall be appointed sole managing conservator or both parents shall be appointed as joint managing conservators of the child unless:

1) the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development.

Act of May 28, 1989, 71st Leg., R.S., ch. 370, § 1, sec. 14.01(b)(1), 1989 Tex. Gen. Laws 1461, 1461, *repealed by* Act of April 6, 1995, 74th Leg., R.S., ch. 20, § 2, 1995 Tex. Gen. Laws 282, 282; *see Brook,* 881 S.W.2d at 298. In essence, the legislature amended the family code to switch the order of the words existing in both provisions; it moved the words "the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development" from behind to in front of the words "[a] parent shall be appointed sole managing conservator or both

parents shall be appointed as joint managing conservators of the child."

2. The majority states, "There is no language in section 153.131 that indicates that the presumption is inapplicable to the appointment of non-parents as joint managing conservators when the trial court also appoints one or both parents." Majority op. at 471. But there was likewise no such language in the version of the statute analyzed in *Brook. Brook,* 881 S.W.2d at 298-99. The majority also argues that the *Brook* and *Connors* opinions regarded "a former statute that did not contain a parental presumption requiring that both parents be appointed joint managing conservators unless rebutted." Majority op. at 472. But again, that change to the former statute is irrelevant to this case because the trial court *did appoint* both Parents as joint managing conservators.

3. This language signals the El Paso Court's opinion that where a court *does not* find significant impairment under the parental presumption, appointment of parents alongside nonparents as joint managing conservators is still proper because in such a situation, the parents have not been excluded from managing conservatorship. *Id.; see Brook,* 881 S.W.2d at 299-300.

4. The majority uses the "legislate from the bench" pejorative phrase in an attempt to show why it would not apply the parental presumption to the right to determine Ryder's primary residence, but it does not explain why that same phrase would not apply to its own expansive interpretation of section 153.131 when that section applies to the appointment of both parents as a child's managing conservators.

---------------



**329 S.W.3d 186**

**David GRAY, Appellant,**
**v.**
**Ann Wood SHOOK, Appellee.**

**No. 13-09-00255-CV.**

**Court of Appeals of Texas,**
**Corpus Christi-Edinburg.**

**Nov. 30, 2010.**
**Rehearing Overruled Jan. 13, 2011.**

[329 S.W.3d 187]

William A. Dudley, Corpus Christi, for Appellant.

Jack W. Marr, Marr, Meier & Bradicich, Victoria, for Appellee.

**Before Justices YAÑEZ, BENAVIDES, and VELA.**

**OPINION**

**Opinion by Justice BENAVIDES.**

Appellant, David Gray, appeals the trial court's appointment of appellee, Ann Wood Shook, as sole managing conservator of his daughter, G.W. By one issue, Gray contends that the trial court abused its discretion because (1) Shook did not offer sufficient evidence of harm to overcome the parental presumption; (2) if the parental presumption was overcome, Shook did not establish harm by a preponderance of the evidence; and (3) Shook offered no evidence of any specific acts or omissions by Gray that would significantly impair the physical health or emotional development of G.W. We reverse and remand.

**I. Background**

David Gray and Lucy Wood are the biological parents of G.W., who was born on July 9, 2003. On January 30, 2007, Gray filed a suit affecting the parent-child relationship

stating, "The best interest of [G.W.] will be served by the appointment of [Lucy] as joint managing conservator [of G.W.] with the exclusive right to designate the primary residence of the child...." Gray also requested that "appropriate orders be made for access to the child and the allocation of the rights and duties of the conservators." On January 23, 2008, Ann Wood Shook, G.W.'s maternal grandmother, filed a petition in intervention stating that she "would show that it is in the best interest of [G.W.] that Intervenor and Respondent [Lucy] be appointed joint managing conservators of [G.W.]." Shook further requested that she "be granted the exclusive right to establish the primary legal residence of the child" and that Gray be appointed possessory conservator of G.W. Gray then amended his petition requesting that he be appointed joint managing conservator with the exclusive right to designate the primary residence of G.W.

[329 S.W.3d 188]

On June 30, 2008, a bench trial was held at which Shook, Gray, Lucy, and Cheryl Green testified.

Shook stated that G.W. has lived in her home in Victoria, Texas since she was born and that when Lucy moved out of Shook's home approximately two years earlier, G.W. continued living with Shook and her husband. Shook testified that she and her husband have been "raising" G.W. for "about a year-and-a-half."



According to Shook, she has filled the role of co-parent with Lucy, and since G.W. was born, Shook and her husband have "taken part in all aspects of raising [G.W.] together" because Lucy "didn't know how much part [Gray] would be in her life." Shook testified that G.W. spends more time with her than with Lucy and that presently, she and her husband are primarily responsible for raising G.W. Shook acknowledged, however, that Lucy was still providing care for G.W. and asked that Lucy be appointed joint managing conservator.

Shook stated that it was in G.W.'s best interest for Gray to be appointed possessory conservator and that it would significantly impair G.W.'s physical health if the trial court appointed Gray managing conservator. Shook testified that she wanted to be appointed managing conservator with the right to determine the residence of the child. According to Shook, if she were not appointed managing conservator, it would significantly impair G.W.'s physical health because

> [i]f [G.W.] were to be taken away from her residence, the only home she's ever known, and moved across the country where she has no family, no support system, I feel—and as an educator and with a degree in counseling, I feel that it would be—and her grandmother, I feel that it would be harmful to her because she has a lot of insecurities now.

On cross-examination, Shook stated that Gray "arrived" after G.W.'s birth and that he did not participate during the pregnancy and did not pay for the medical expenses related to G.W's birth. According to Shook, from the time of G.W.'s birth until the time of trial, Gray had not had contact with G.W. on a monthly basis. Shook stated that Gray has had approximately three to four visits with G.W. per year in the last five years. Shook testified that Gray lived in Houston when G.W. was born; he then moved to New Jersey, then to Denver, Colorado, and then

to Seattle, Washington. Shook said that when G.W. was born, Lucy moved into Shook's home and that for a short time, Gray took an "active role" and visited G.W. at least every other weekend; however, the visits soon became "sporadic."

Shook testified that G.W. has started pre-school and that G.W. attends gymnastics, dance class, and play groups with her friends. According to Shook, Lucy usually spends the night at Shook's house and does not take G.W. away for overnight visits because they do not want to "jerk [G.W.] back and forth." Shook stated that she does not intend to move away from Victoria.

Shook testified that Gray did not acknowledge G.W. as his child while Lucy was pregnant, but after G.W. was born, a paternity test was performed. Shook stated that when Gray was transferred to New Jersey, he did not visit G.W. "real often" and that during that time, G.W. bonded with Shook and Lucy; Shook explained that bonding means "creating a safe place—a place in the relationship where a child feels safe, unquestionably taken care of." Shook did not believe that G.W. bonded with Gray during the first year of her life. She stated that after approximately two years in New Jersey, Gray moved to Denver; during that time, he visited

[329 S.W.3d 189]

G.W. two to three times per year. According to Shook, while Gray has lived in Seattle, he has visited G.W. three to four times per year and that in the last year, Gray had seen G.W. "[a] little more regularly." When asked, "And if you were to define her world of comfort, who are the people that are involved in her world of comfort right now," Shook replied, "My husband, myself[,] ... her mother[,] and her [maternal] aunt and her [maternal] uncle." Shook claimed that Gray had not contacted G.W. by telephone on a regular basis and that to her knowledge, Gray had only called G.W. once since she was four years old. When asked what the impact on G.W. would be if she were removed from



Shook's home and moved to Seattle, Shook stated:

> It would be devastating at this point in her life. Her world as a five-year-old revolves around her safety and her security. And she already worries and obsesses over things because of the insecurity of her dad in and out of her life. The only thing constant in her life since birth has been my husband and I and her mother has been there as a presence.

Shook stated that her "position is [Gray] should see [G.W.] more often, that he needs to build a relationship and be a full part of her life, not just visit occasionally" and that it would be "devastating to [G.W.]" if Gray were allowed to transport G.W. to Seattle because she had "never been more than a night or two without [Lucy], [Shook,] or [Shook's] husband." According to Shook, no relationship exists between G.W. and Gray; therefore, Gray's visitation should be increased gradually "until [G.W.] feels safe and comfortable with him at [the Shooks'] home in Victoria or other places."

On re-direct examination, Shook stated that although Gray has been interested in visiting with G.W., "[t]he desire for seeing her more than he has been is sudden as of the last hearing." Shook believed that if G.W. were transported to Seattle, she could suffer physical harm, such as "stomach [aches], throwing up, grinding her teeth." Shook testified that the trial court had ordered Gray to visit G.W. three times before the end of the year 2007 because Gray had only visited G.W. once that year and that Gray had complied with the order.

Shook denied that she and Lucy "resisted" allowing Gray any visitation time with G.W. and that they had "always encouraged [Gray] to be part of her life." When asked to substantiate her opinion that G.W. would suffer from physical and emotional harm if she were removed from Shook's home, Shook stated that:

> [c]ounselors other than myself, child counselors that [G.W.] has visited with that [sic] has told me this and is willing to testify here today. It's not just my opinion, it's ... Any adolescent child psychology book that you read, when you take a child's world away from them, the only world that they know, and put them in another world has harmful effects.... [And G.W.] would not have family support [if she moved to Seattle].... [Gray] has not one relative that lives in Seattle. [G.W.] in Victoria has a wide family support system and that is the most important thing in her life.

The trial court asked Shook several questions regarding Lucy's parental involvement. In her answers, Shook acknowledged that Lucy does not visit G.W. every day, does not pay any child support to Shook, and that Shook still provides financial support to Lucy. When asked why Shook had possession of G.W., Shook replied:

[329 S.W.3d 190]

> Lucy suffers from depression, which she is being treated for and sees a doctor and is trying to get help. She maintains a job fulltime and she struggles to provide a place where [G.W.] can come. She struggles to provide a car. She's having a hard time. And she wants to be a fulltime mother but she feels—and we've always discussed [G.W.] openly between ourselves—and we feel together that it's better not to drag [G.W.] from one place to the other. Lucy visits her at our home and she may financially have to move back into our home with [G.W.].



Shook stated that she believes that G.W. is safer living with her rather than living with Lucy and that she and her husband have been the "only consistent thing" in G.W.'s life.

Green, a licensed clinical social worker,[1] testified that she had been counseling G.W. for two months prior to the trial due to G.W.'s separation anxiety. Green stated that:

> [G.W.] has had several instabilities in her life to date. She's been back and forth with her biological mother and is currently residing primarily with her biological grandmother and step grandfather. There's been inconsistencies due to the mother's difficulties, which have led to some anxieties in this child's life. She has some separation anxiety, she doesn't like to be alone, she's very controlling, she's very needy, needs lots of attention. She won't sleep alone in a room.

According to Green, stability and consistency are very important to a child experiencing anxiety. Green explained that a child G.W.'s age is not able to bond with a person who visits every three to four months and that for bonding to occur, more frequent contact is necessary. When asked whether it is detrimental to a relationship between a child and a parent for there to be infrequent or large gaps between visits, Green replied that it would not affect the relationship in a positive manner and "as far as the two people bonding together, it's going to keep that from happening." She opined that for a child to bond to someone, that person must be consistently in the child's life. Green stated that to achieve that level of bonding, the person should have regular communication with the child by mail, telephone, or "face-to-face." Green testified that visits once every two months are inadequate for bonding to occur and that she did not "feel" that G.W. had an adequate bond with Gray, meaning that G.W. "would sense" Gray as a stranger. Green opined that bonding

could occur if Gray maintained regular communication. Green stated:

> You know, from what I understand, the only time [G.W.] interacts with [Gray] is when he's here. There's no phone calls, there's no letters, there's no little pictures sent in the mail, none of those things that would be appropriate communication with a four-year-old, which is frequent when parents are geographically distanced, they make the effort to have regular weekly phone contact or some kind of interaction with a child.

According to Green, G.W. considers Shook her "primary parent" and she feels "safe" in Shook's home environment. Green testified that because of G.W.'s separation anxiety, a situation that causes more stress, such as allowing her to leave her home, could cause long-term problems

[329 S.W.3d 191]

such as "[p]oor performance in school, poor socialization, difficulty in relationships" and more serious problems such as depression and the risk of drug use. Green explained that extended periods of visitation with Gray in Seattle could cause G.W. to "regress, she could become increasingly more anxious and more clingy." Green stated, "I understand that when she's gone on visits in the past with the father she's been throwing up out of anxiety, possibly, since it's been a recurring event."

Green testified that if G.W. was removed from Shook's home, she would "freak out," cling to Shook, cry, scream, and throw up. According to Green, if the visitation schedule "is too accelerated," there could be problems "such as the continued vomiting during visits ... bed-wetting ... anxiety.... Maybe even she would become more controlling, more bossy, which could cause problems with her peer interaction."



Gray testified that he works for Skansa, USA Building as an engineer and his salary is $85,000 a year. According to Gray, in the past, there has been "some resistance" to his visiting with G.W. and that there was difficulty in exercising his last visitation with G.W. Gray stated:

> The day prior to me making the trip down here I called Lucy, her mother—G.W.'s mother, that is—and inquired where and when I could pick her up, understanding that it was nine, but just to confirm things. And [Lucy] informed me that her daughter was out of town and didn't know exactly when she'd return or where she was at that moment but she would call and inquire into that. And I asked her to finally return my call and let me know what time the next morning I could pick her up and where that would be.

> A few hours later, seven o'clock my time, nine o'clock here, I was getting ready to board an overnight plane flight down here and I called back—I've also called [Shook's] house at that time to see if I could find someone there that could answer that question. Phone calls were not answered, messages were left and I never heard back from them.

> And the next morning on my way down from Houston in a car, after flying in there, I made another round of calls with no answers or return messages. And then later in that morning I got a call from [Shook], informing me that they were in Austin or somewhere in that area and that they were thinking about leaving relatively soon,

that they would be down in a few hours.

According to Gray, the visitation that was scheduled to begin at 9:00 a.m. actually began at 1:30 p.m., and he did not make that time up by returning G.W. later. Gray stated that his visitation with G.W. went "exceptionally well," they had a lot of fun together and that he and G.W. have a strong healthy bond and relationship.

Gray testified that he lives with his girlfriend, Allison, in a house he recently purchased and that there is a bedroom for G.W. Gray started a college fund for G.W. and provides health insurance for G.W., which he started doing "immediately following the first month of [G.W.'s] life." Gray claimed that at the time of G.W.'s birth, it was "very unclear who the father was" and that was the reason Lucy carried her own medical insurance during the pregnancy and birth.

Gray stated that he was requesting custody of G.W. because it had become increasingly difficult to be as involved in her life as he would like to be. Gray testified that he had not been aware that G.W. lived with Shook until she filed her petition for intervention; therefore, when he became aware of the situation, Gray decided that he should seek custody of G.W. Gray believed

[329 S.W.3d 192]

that G.W.'s living conditions were temporary and "evolved out of convenience almost in that Lucy was not taking care of [G.W.] as much as needed...." He also believed that he could provide for G.W. and nurture and love her as much as Shook has. Gray stated:

> Lucy's interest in [G.W.'s] upbringing has not been as we would hope as a parent, and I think that's even gone slightly less over the years and just kind of withered away. I think as a young mother she's been, you know, reluctant to give up parts



of her life that, you know, are enjoyed by single people and it's put [G.W.] in an uncomfortable situation there.

On cross-examination, Gray stated that Lucy had not been willing to provide financial support and time to G.W. but that he has done so. Gray stated that he lived in New Jersey for approximately one year and that he would be "hard pressed to recall the exact number" of times he visited G.W., but thought he saw her every two months on average. Gray claimed that at that time, it was difficult to contact G.W., and Lucy made visitation difficult for him by only allowing short, supervised visits with G.W. Gray stated that when he lived in Colorado, he visited G.W. on average every two months. Gray testified that he was unable to visit G.W. on a monthly basis because his employer only allowed ten days of vacation per year and therefore, "[t]here's not that many days in the year vacationwise to do that." On cross examination by Shook's attorney, Gray testified that in order to visit G.W. in Victoria, he is required to take at least "three days of vacation wrapped around a weekend." Therefore, Gray stated, "Ten days of vacation means you do that three times a year, you've used your vacation for that year." Gray also explained that it was expensive to make more visits. When asked if he had "telephone visits" with G.W., Gray replied, "I have in the past had many phone conversations with her. In recent months phone calls are unanswered, unreturned. Phone records could easily indicate the hundreds of phone calls tabbed and made." No phone records were admitted into the record.

Gray admitted that he decided not to look for employment in Texas although he believed that he could have found a job there. When asked why he chose not to live in Texas if his primary consideration was G.W., Gray responded, "I don't believe location is exclusive of visiting my daughter. Those two things don't have to contradict each other in any way." Gray explained that moving to Seattle would allow him more visitation time with G.W. because he made more money and he would never be asked

to relocate from Seattle. According to Gray, if G.W. moved to Seattle to live with him, due to the flexibility of his work schedule, he could on certain occasions work from home and would be able to transport G.W. to and from her school.

Gray stated that the reason he could not visit with G.W. more than once every two months is due to her inability to leave Victoria. Gray thought that it would have been better if G.W. had been allowed to travel by plane to visit him in addition to his visits to Victoria. According to Gray, for "close to three years," he attempted to negotiate with Lucy a plan for G.W. to visit him. Gray explained, "I was hoping that we could eventually work something out that was mutually agreeable. Eventually communications have broken down to the point that phone calls are unreturned, unanswered, and they were unbending in their requests and demands." Gray acknowledged that "[v]isitation was highly restrained, but as a mature, responsible parent [he] always hope[d] and [his] goal

[329 S.W.3d 193]

was that [he and Lucy] could work out some mutually agreeable terms and conditions of that."

According to Gray, his bond with G.W. is "very strong," but because of the recent "extraordinarily strained" relations, contact with G.W. has not been permitted. Gray testified that when he visited with G.W., she did not demonstrate any behaviors indicating that she was suffering from separation anxiety. Gray stated, "Regarding her getting sick, she's gotten sick one time in my presence. During my last visit I picked her up from dance and she was ill on the way home in the car and recovered within the hour and was playing again." Gray testified that he picked G.W. up at Lucy's residence "a number of times" and also from Shook's residence for visitation. Gray stated that it had been "less than a year" since he picked G.W. up at Lucy's residence.



Gray claimed that he was unaware that G.W. resided with Shook and that his "family [in Victoria] didn't know." When asked, "How hard do you think it would have been had you looked to figure out where the child was living," Gray responded, "How hard would it have been had I looked? I looked as far as I could; that is, she clearly maintained two residences. That is, all of her toys were both at [Lucy's] house and she had a lot of toys at [Shook's] house. As recently as yesterday, for example, [G.W.] stated I live with [Shook]. Oh, I'm not supposed to say that."

Shook's trial counsel asked Gray if he agreed with Green's testimony that it was not in G.W.'s best "interest to be uprooted and moved to Seattle." Gray replied, "I don't sir, in that I believe that she's in a damaging and destructive environment currently and that currently her care is loving and nurturing but a little bit over controlling and possessive in a way that may lead to some of these issues." During re-cross examination, Shook's counsel asked, "Would that be in [G.W.'s] best interest to remove her that distance from the people that have taken care of her during the first five years of her life," Gray replied:

> Taken care of her, I don't really accept how you use the phrase, but I believe it would be in her best interest. They've cared for her and I greatly appreciate what they have done to provide the temporary solution they have. That as a more permanent solution I see her living with one of her parents, and that would be myself if the mother is not taking care of her, which has been the case. So, I believe that it would be in my daughter's best interest to reside with me in Seattle.

When asked if Gray believed he had "stepped up to the plate and assumed the responsibility a parent should," Gray responded,

Yes, I have stepped up to the plate in that I have consistently been in her life. As soon as I had any indication she wasn't living with her biological parent, I pressed for this, right? That's why we're here today, is because I have been trying to step up to the plate and seek more and more time with G.W. since the day she was born, while they have pushed very hard back against that.

Gray claimed that immediately after G.W. was born, he initiated some action, which he did not explain, in order to assert his parental rights. Shook's attorney stated, "You haven't done anything to establish rights to possession and access to medical records and to school records, you haven't done any of those things until you filed this lawsuit." Gray replied, "That's not true in that, as stated, right after she was born we sought all those things which you just discussed and...." When Shook's

[329 S.W.3d 194]

counsel asked Gray to produce the court orders establishing those rights, Gray said, "We could pull them up. There were court orders, there were attorneys involved the month after she was born involving just what you're discussing, sir." Lucy's trial counsel then asked the trial court to take judicial notice of the fact that the pending action was the only suit affecting the parent-child relationship that had been initiated and that it was not filed one month after G.W. was born. Gray then stated, "That's correct, it never reached—it never reached the court at that point, we were negotiating between the attorneys and it was, like I said, a standard parental—I forget the right term for it right now—but acknowledgment of parent, that sort of thing that we went through at that time."

Lucy testified that G.W. lives with Shook and has lived at the Shook residence for approximately one year. Lucy stated that she and Shook decided to share the parental responsibilities because Lucy "needed help raising" G.W. According to Lucy, she was diagnosed with depression when she was in eighth grade, and since then, she has been taking



medication for that disease. After G.W. was born, Lucy moved in with Shook and lived there two or three years. Lucy stated that she believes that it is in G.W.'s best interest to continue living with Shook and that she is available to participate in raising G.W.

Lucy denied that she ever prevented Gray from visiting with G.W. and claimed that she "encouraged" him to visit regularly and more often. Lucy stated that it would be better for G.W. if Gray had more contact with her. Lucy also denied that she ignored Gray's telephone calls. Lucy explained that the "supervised" visits occurred when she was breast feeding G.W., which she did for "a little over a year." Therefore, it was "necessary" for her to be present during those visitations. Lucy testified that she did not want to prevent Gray from having visits with G.W. and that she believes it is "very important" for G.W. to visit Gray.

Lucy stated that G.W. was "around" two when Gray moved to New Jersey and that she was not aware of any requests from Gray for G.W. to be flown to New Jersey for a visit. Lucy testified that she has concerns about allowing G.W. to fly to Seattle because she suffers from separation anxiety and she would be scared due to her young age. Lucy agreed that she would work with G.W. to help her overcome her anxiety. However, Lucy did not believe that it would be in G.W.'s best interest for Gray to be appointed sole managing conservator and that it was in G.W.'s best interest to continue living with Shook.

On cross-examination, Lucy said that it was not true that Gray had placed hundreds of telephone calls to G.W. Rather, she testified that before the suit was filed, Gray called approximately twice a month to talk to G.W. Lucy stated that Gray visited G.W. two or three times per year, usually during a holiday like Christmas or Thanksgiving. When asked why Gray did not visit more often, Lucy replied, "I guess numerous reasons, being the expense, the travel expense. Other plans. For example, he had a four-or five-day trip down to Texas over New Year's Eve once and was only in Victoria two

days out of that time, the other three days he spent in Austin or Dallas with friends." Lucy believed that Gray's infrequent visits have "damaged" his relationship with G.W.

The trial court appointed Shook managing conservator with the right to determine G.W.'s residence and appointed Gray and Lucy possessory conservators. The trial court ordered that neither possessory conservator live in the same residence with

[329 S.W.3d 195]

G.W. and Shook. The trial court entered findings of fact and conclusions of law, which stated in pertinent part:

> 4. The Court finds that at the time of filing of the Petition in Intervention, Intervenor [Shook] had actual care, control, and possession of the child made the subject of this suit for more than six months ending no more than 90 days preceding the date of filing of the Petition in Intervention.
>
> 5. The Court finds that it is in the best interest of the child made the subject of this suit that [Shook] be appointed Sole Managing Conservator of the child made the subject of this suit.
>
> 6. The Court finds that it is in the best interest of the child made the subject of this suit that [Gray] be appointed possessory conservator of the child made the subject of this suit.
>
> 7. The Court finds that appointment of [Gray] as joint managing conservator of the child made the subject of this suit would not be in the best interest of the child made the subject of this suit because the



appointment would significantly impair the child's physical health or emotional development.

Gray requested additional findings of fact "on how appointment of a parent or the parents as sole or joint managing conservator in the instant case would significantly impair the child's physical health or emotional development, including, what facts, if any, in the record, support said findings." The trial court did not make any additional findings of fact, and this appeal ensued.

## II. Standard of Review and Applicable Law

An appellate court reviews the determination of conservatorship under an abuse of discretion standard. *Whitworth v. Whitworth,* 222 S.W.3d 616, 622-23 (Tex.App.-Houston [1st Dist.] 2007, no pet.) (op. on reh'g) (citing *Gillespie v. Gillespie,* 644 S.W.2d 449, 451 (Tex.1982)). "Under an abuse-of-discretion standard, legal and factual insufficiency are not independent grounds of error, but rather are relevant factors in assessing whether the trial court abused its discretion." *Baltzer v. Medina,* 240 S.W.3d 469, 475 (Tex.App.-Houston [14th Dist.] 2007, no pet.); *see also Morris v. Morris,* No. 13-05-00297-CV, 2007 WL 2128882, at *2-3, 2007 Tex.App. LEXIS 5878, at *6-7 (Tex.App.-Corpus Christi July 26, 2007, no pet.) (mem. op.). The trial court abuses its discretion if its decision is arbitrary or unreasonable. *Whitworth,* 222 S.W.3d at 623. A trial court may also abuse its discretion if it fails to analyze or apply the law correctly. *In the Interest of C.A.M.M.,* 243 S.W.3d 211, 215 (Tex.App.-Houston [14th Dist.] 2007, pet. denied) (citing *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992) (orig. proceeding)). The trial court does not abuse its discretion if there is some evidence of a substantive and probative character to support the decision. *Whitworth,* 222 S.W.3d at 623.

"The presumption that the best interest of a child is served by awarding custody to a natural parent is deeply embedded in Texas law."

*Lewelling v. Lewelling,* 796 S.W.2d 164, 166 (Tex.1990). Therefore, section 153.131 of the family code requires that the parent be appointed sole managing conservator or both parents be appointed joint managing conservators unless the nonparent proves by a preponderance of the credible evidence that "appointment of the parent or parents would

[329 S.W.3d 196]

not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development...." Tex. Fam.Code Ann. § 153.131 (Vernon 2008); *In re De La Pena,* 999 S.W.2d 521, 527 (Tex.App.-El Paso 1999, no pet.). The family code's presumption in favor of parental custody places a "heavy burden on a nonparent seeking custody." *May v. May,* 829 S.W.2d 373, 376 (Tex.App.-Corpus Christi 1992, writ denied). To rebut the presumption, "the evidence must support a logical inference that some specific, identifiable behavior or conduct of the parent will probably cause significant physical or emotional harm to the child." *Id.* at 377. Any "close call" must be resolved in favor of the parent over the nonparent. *Chavez v. Chavez,* 148 S.W.3d 449, 459 (Tex.App.-El Paso 2004, no pet.).

## III. Analysis

Shook relies heavily on Green's testimony that G.W. had suffered from separation anxiety and that because she had not bonded with Gray, it would not be in her best interest to move to Seattle. If the evidentiary burden on a nonparent was *any* evidence of *any* harm to the child, we would be required to find that the trial court acted within its discretion in this case. However, as we discuss below, the law requires the evidence to rise above mere speculation of harm, and further requires the harm to be attributable to a specific, identifiable act or omission of the parent. The trial court abused its discretion, and therefore, we sustain Gray's sole issue, because: (1) Shook failed to offer any evidence of a specific, identifiable act or omission by Gray that would be likely to harm G.W; and (2) the



evidence of the general harm caused by "uprooting" in this case is only speculative and therefore could not rebut the parental presumption.

### A. Specific, Identifiable Act or Omission

Gray contends that the trial court abused its discretion because the record does not legally— or even factually—demonstrate specific acts or omissions by Gray that would significantly impair the physical health or emotional development of G.W. We agree.

In order for a nonparent to overcome the presumption that it is in the child's best interest to be in the custody of a parent, there must be evidence of "specific, identifiable" conduct by the parent that is likely to cause harm to the child's physical health or emotional development.[2] In

[329 S.W.3d 197]

*May v. May,* this Court wrote that the family code

> requires evidence of specific actions or omissions of the parent that demonstrate an award of custody to the parent would result in significant physical or emotional harm to the child.... In other words, the nonparent must usually present evidence affirmatively showing conduct of the parent which will have a detrimental effect upon the child, such as physical abuse, severe neglect, abandonment, drug or alcoholic abuse or very immoral behavior on the part of the parent.
> 829 S.W.2d 373, 376-77 (Tex.App.-Corpus Christi 1992, writ denied) (citing *Lewelling v. Lewelling,* 796 S.W.2d 164, 167 (Tex.1990)). In *May,* we ultimately held that the father could not retain custody of the

children, but that holding was based on the fact that the father had been a drug user in the recent past, and the holding was only made after a careful and deliberate finding of a specific, identifiable act of the parent that would significantly impair the child's physical health or emotional development. *See id.* at 377-79.

In *Lewelling,* the Texas Supreme Court emphasized the portion of the statute under which a nonparent may obtain custody if "the court finds that appointment of the parent or parents would not be in the best interest of the child because *the appointment would significantly impair the child's physical health or emotional development.*" *Lewelling,* 796 S.W.2d at 166 (emphasis in original). After emphasizing this specific language, the court instructed that:

> The [statutory] language requiring a showing that appointment of the parent would significantly impair the child's

[329 S.W.3d 198]

> physical or emotional development creates a strong presumption in favor of parental custody and imposes a heavy burden on a nonparent. It is no longer adequate to offer evidence that the nonparent would be a better custodian of the child.... [T]he nonparent must affirmatively prove by a preponderance of the evidence that appointment of the parent as managing conservator would significantly impair the child, either physically or emotionally. *This statute thus requires the nonparent to offer evidence of specific actions or omissions of the parent that demonstrate an*



*award of custody to the parent would result in physical or emotional harm to the child.*

*Id.* (internal citations omitted) (emphasis added). Absent evidence of some specific act or omission by Gray that would cause G.W. harm, the parental presumption can not be overcome. We find no such evidence in the record.

The evidence in this case shows that the only possible harm to the child is the "uprooting" itself—not any specific, identifiable act or omission, conduct or behavior of Gray. Therefore, it was an abuse of discretion for the trial court to name Shook, a nonparent, sole managing conservator of G.W.

### B. Speculative Harm

Furthermore, even if we look at general harm, not attributable to Gray's specific acts or omissions, Shook failed to present any evidence that could overcome the parental presumption because the evidence presented raises only speculative harm.

In *May,* this Court wrote that "[the] harm to the child ... may not be based on evidence which raises a mere surmise or speculation of possible harm." *May,* 829 S.W.2d at 377 (citing *Kindred v. Con/Chem., Inc.,* 650 S.W.2d 61, 63 (Tex.1983); *Briones v. Levine's Dept. Store, Inc.,* 446 S.W.2d 7, 10 (Tex.1969)).

Shook essentially relies on one theory of harm in order to justify the trial court's judgment that Shook had overcome the parental presumption. That theory can be summarized as follows: (1) Green testified that G.W. suffers from "some" separation anxiety; (2) this anxiety has caused "recurring vomiting" in the past, could effect her peer relationships in the future, and may lead to other long-term problems; and (3) these harms can be prevented if G.W. remains with Shook because G.W. feels safe with Shook and G.W. has not bonded with Gray.

Evidence of sporadic, past vomiting and the *possibility* of negative effects on peer relationships is insufficient evidence to rise

above a mere speculation of harm. The record indicates that vomiting had occurred on only one or two occasions out of the dozens of times G.W. has met with her father, and on closer review of the record, Green testified that the vomiting was "possibly" caused by anxiety. Moreover, there is no evidence that all of the other alleged dangers to G.W.'s emotional development were more than a mere possibility. For example, on direct examination, when asked, "Can you give the Court some example[s] of what some of those additional problems might be [?]," Green responded, " *sometimes* depression develops, *sometimes* they're at risk for drug use," and further responded, " *oftentimes* we see long-term problems." (Emphasis added). These are the exact types of speculative harms that we prohibited from consideration in *May. See May,* 829 S.W.2d at 377. Without consideration of this speculative harm, there is no evidence whatsoever to rebut the parental presumption. Therefore, again, we hold that the trial court abused its discretion in appointing Shook,

[329 S.W.3d 199]

a nonparent, as G.W.'s sole managing conservator.

### IV. Conclusion

Because we hold that the trial court abused its discretion by appointing Shook to be G.W.'s sole managing conservator, we sustain Gray's sole issue. Having failed to meet her burden, Shook may not maintain any legal custodial rights over G.W. "In most circumstances, a judgment is reversed and rendered when a legal sufficiency challenge is sustained." *Chavez,* 148 S.W.3d at 461. However, we are permitted to remand a case such as this "when the interest of justice so requires." *Id.* (citing Tex.R.App. P. 43.3). In this case, the trial court held in Shook's favor, making it unnecessary for that court to determine G.W.'s best interest as it related to the custodial or visitation rights that should exist between Gray and Lucy only. Because of this, and because we have overturned the trial court's ruling designating Shook as sole managing



conservator, we find it to be in the interest of justice not to simply render judgment in Gray's favor. Further, more than a year has passed since the custodial hearing; circumstances may have changed during this time such that it would not be in G.W.'s best interest to appoint Gray as her sole managing conservator, and we have no ability to determine the present circumstances of any of the parties, nor do we have the luxury of sitting as a fact-finder. For the forgoing reasons, we remand this case to the trial court for custodial hearings to determine the rights as between Gray and Lucy only.

### Dissenting Opinion by Justice LINDA REYNA YAÑEZ.

### Dissenting Opinion by Justice YAÑEZ.

I respectfully dissent to the majority's conclusion that the trial court abused its discretion in this case. A trial court does not abuse its discretion when there is some evidence of a substantive and probative character to support its decision.[1] In some cases, the parental presumption can be rebutted by other evidence establishing the statutorily required negative effect on the child even when there is no evidence establishing any particular blameworthy act of the parent.[2] "Because safety, security, and stability are critical to child development, the danger of uprooting a child may in some instances rise to a level that significantly impairs the child's emotional development." [3]

Here, Green testified that G.W. suffers from separation anxiety, a condition she defined as a fear of being separated from either the parent or person of significance. Green testified that G.W. considers Shook her "primary parent" and feels "safe" in Shook's home. The evidence showed that G.W. has lived with Shook since she was born and has never known another home.

Green stated that stability and consistency are very important to a child who

[329 S.W.3d 200]

experiences anxiety. Green testified that consistency is also an important factor in bonding with a child and that when there are infrequent visits or large gaps between the visits, bonding will not occur. Green opined that a child is unable to bond with a person who only visits the child three or four times per year. The evidence showed, although contradicted by Gray, that he had only visited G.W. three or four times per year since he moved away from Texas.[4] Furthermore, according to Green, G.W. viewed Gray as a stranger, and Gray has not bonded with G.W. because he has not spent enough time with her. Green stated that in order to bond with G.W., more frequent contact was necessary.

According to Green, after visiting Gray, G.W. has vomited due to her anxiety. Green testified that G.W. would "freak out" if she was removed from Shook's home and that she would vomit, scream, and cry. Due to G.W.'s separation anxiety, Green stated that the added stress of removing her from Shook's home could cause numerous problems for G.W.

Shook testified that G.W. has lived in her home since she was born, that she has been "raising" G.W. for approximately a year-and-a-half, and that G.W. spends more time with Shook than with Lucy. According to Shook, it would significantly impair G.W.'s physical health if Gray was appointed managing conservator because G.W. would be removed from the "only home she's ever known." Shook testified that G.W. had never been away from Shook, Shook's husband, or Lucy for more than "a night or two." Shook stated that G.W. has bonded with her and that it would be "devastating" to G.W. if she were removed from Shook's home. Shook testified that G.W. would suffer harmful effects if removed from her home because she would not have any family support in Seattle. Shook stated that appointing Gray managing conservator and removing G.W. from Shook's home would have harmful effects.

In this case, there was evidence presented that the danger of uprooting G.W. from Shook's home would significantly impair G.W.'s



physical health and emotional development.[5] Therefore, the trial court could have reasonably concluded from the evidence that appointing Gray managing conservator would have the statutorily required negative effect on G.W.[6] Because there is some evidence of a substantive and probative character to support the trial court's decision, I believe that the trial court did not abuse its discretion by concluding that Gray's appointment as managing conservator would significantly impair G.W.'s physical health or emotional

[329 S.W.3d 201]

development.[7] Therefore, I would affirm the trial court's judgment.

[1] There is no evidence that Green had obtained a medical degree, and she did not claim to be a psychologist or psychiatrist.

[2] The dissent cites three cases from our sister courts to support the proposition that a nonparent may be awarded custody even without a blameworthy act of the parent. Each of those cases is distinguishable from the present case, and moreover, the precedent in those cases is not binding on this Court.

First, in *In re G.R.W.,* the Texarkana Court was dealing with circumstances much different from those in this case. 191 S.W.3d 896, 898-900 (Tex.App.-Texarkana 2006, no pet.). In that case, the father of the child had been indicted for sexual assault of the mother for the very sexual encounter that led to the birth of the child, and the father was convicted of the lesser offense of child endangerment. *Id.* at 898. Moreover, the court pointed to the fact that the father was a smoker and that the child had severe respiratory problems. *Id.* at 900-01. These facts establish specific, identifiable acts of the parent that would be likely to impair the physical health or emotional development of the child. Further, there is no indication that the

Texarkana Court relied on the proposition that a nonparent may be awarded custody of a child without a blameworthy act of the parent; the opinion seems to merely state this proposition in dicta. *See id.*

Second, in *In re Rodriguez,* the facts are again distinguishable in a meaningful way from the present case. 940 S.W.2d 265, 266-70 (Tex.App.-San Antonio 1997, writ denied). In that case, the birth mother gave the child up for adoption and relinquished all parental rights, and the father had met the child only twice in the child's life. *Id.* at 267-69. Moreover, there was evidence presented that all interactions and visitations were initiated and facilitated by the child's paternal grandmother, not by the father himself indicating a lack of concern for the child, especially in the child's early life, which the evidence does not support in this case. *Id.* at 269-70. Additionally, the majority for the San Antonio Court wrote that it didn't believe that "[section] 153.131, Texas Family Code contemplates that the environment which 'significantly impairs the child's physical health or emotional development' must be the product of some act or omission on the part of the natural parent," which we consider to be a blatant misstatement of the law. We concur with Justice Carr's dissent insofar as it applies to this case. In response to the majority, Justice Carr wrote:

[W]hile I agree with the majority that our record reflects "that there is no evidence that any act or omission, behavior, or conduct by [the father] will impair [the child]," I respectfully dissent because, unlike the majority, I do not agree that this case is a case of first impression nor distinguishable



from *Lewelling v. Lewelling,* 796 S.W.2d 164 (Tex.1990). I would hold on this legal issue that *Lewelling* is controlling; and, that at the present time [and] under the current state of Texas laws, the *Lewelling* standard that non-parents seeking custody here cannot benefit from their bonding or attachment with the child by "offering it as some evidence of significant impairment to [the child]." *Id.* at 168. Accordingly, because [the nonparent's] significant impact argument was rejected by our Supreme Court in *Lewelling,* we are required to reject the same argument here.

*Id.* at 275 (Carr, J., dissenting).

Third, in *Chavez v. Chavez,* the mother who was seeking to reacquire custody was shown to be a drug user and there was evidence that she was physically abusive. 148 S.W.3d 449, 453 (Tex.App.-El Paso 2004, no pet.). The El Paso Court overturned the trial court's ruling against the mother on other grounds and never actually reached the issue of whether these specific, identifiable acts or some other reason would prevent the mother from maintaining custody of the children. *Id.* at 459. If the dissent agrees with the reasoning in *Chavez,* it should at least recognize the present case as a "close call," and settle any doubt in favor of the parent, as the El Paso Court required. *See id.*

[1] *Whitworth v. Whitworth,* 222 S.W.3d 616, 623 (Tex.App.-Houston [1st Dist.] 2007, no pet.) (op. on reh'g).

[2] *In re G.R.W.,* 191 S.W.3d 896, 900 (Tex.App.-Texarkana 2006, no pet.) ("In fact, even without evidence establishing any blameworthiness of the parent, the parental presumption can be rebutted by other evidence establishing the statutorily required negative effect on the child."); *In re Rodriguez,* 940 S.W.2d 265, 273-75 (Tex.App.-San Antonio 1997, writ denied) (concluding that nonparent had rebutted parental presumption solely by producing evidence that the effect on the child of being removed from the only home she had ever known would be "devastating").

[3] *Chavez v. Chavez,* 148 S.W.3d 449, 458-59 (Tex.App.-El Paso 2004, no pet.) (citing *De La Pena,* 999 S.W.2d at 529).

[4] I note that Green testified that even visits with a child once every two months, as Gray claimed he did, is inadequate for bonding to occur.

[5] *See In re G.R.W.,* 191 S.W.3d at 900; *Chavez,* 148 S.W.3d at 458-59; *In re Rodriguez,* 940 S.W.2d at 273-75.

[6] *See* Tex. Fam.Code Ann. § 153.131; *In re G.R.W.,* 191 S.W.3d at 900; *Chavez,* 148 S.W.3d at 458-59; *De La Pena,* 999 S.W.2d at 529 ("We also agree that because safety, security, and stability are critical to child development, the danger of uprooting a child may in some instances rise to a level that significantly impairs the child's emotional development."); *In re Rodriguez,* 940 S.W.2d at 270-75; *see also In the Interest of R.T.K.,* 324 S.W.3d 896, 905 (Tex.App.-Houston [14th Dist.] 2010, no pet.) (mem. op.) (concluding that the record sufficiently supported the trial court's conclusion that the nonparent rebutted the presumption found in section 153.131(a) because based on the evidence presented, the trial court could have reasonably concluded that removal of the child from "the only home he has known" would significantly impair his emotional development).

[7] *See Whitworth,* 222 S.W.3d at 623; *see also In the Interest of C.A.M.M.,* 243 S.W.3d at 214-15 ("But the fact that a trial court may decide a matter within its discretionary authority in a different manner from an appellate court in a similar circumstance does not demonstrate an abuse of discretion.") (citing *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241-42 (Tex.1985)).



**381 S.W.3d 540**
**56 Tex. Sup. Ct. J. 10**
**Ann Wood SHOOK, Petitioner,**
**v.**
**David GRAY, Respondent.**
**No. 11–0155.**
**Supreme Court of Texas.**
**Oct. 5, 2012.**

**Summaries:**

**Source: Justia**

G.W., David Gray and Lucy Wood's nine-year-old daughter, had lived with her maternal grandmother, Ann Shook, for her entire life. The trial court appointed Shook as G.W.'s sole managing conservator and named Gray and Wood as G.W.'s possessory conservators. The court of appeals reversed, holding that the trial court abused its discretion in naming Shook, a nonparent, as G.W.'s sole managing conservator because Shook failed to present any evidence that could overcome the presumption that a parent should be named as managing conservator. The court then remanded the case to the trial court to determine the custody and visitation rights as between Gray and Wood only. The Supreme Court affirmed the court of appeals' judgment remanding the case but reversed to the extent the judgment limited the trial court's consideration of the role Shook should play in G.W.'s life, whether as conservator or a person with defined access rights.

[381 S.W.3d 541]

Cynthia T. Sheppard, Attorney at Law, Cuero, Jack W. Marr, Marr, Meier & Bradicich LLP, Victoria, for Petitioner.

Audrey Mullert Vicknair, Law Office of Mullert Vicknair, William A. Dudley, Law Office of William A. Dudley, P.C., Corpus Christi, David S. Kidder, Dallas, for Respondent.

**PER CURIAM.**

G.W., David Gray and Lucy Wood's nine-year-old daughter, has lived with her maternal grandmother, Ann Shook, for her entire life. Although G.W.'s parents have been in and out of her life to varying degrees since she was born, no one disputes that at the time of the custody hearing the grandmother's home was the only home G.W. had ever known. We are asked to decide whether the court of appeals erred by remanding this case to the trial court for hearings to determine the custody and visitation rights as between Gray and Wood only. We grant Shook's motion for rehearing of her petition for review and, pursuant to Rule 59.1 of the Rules of Appellate Procedure, hold that, by barring the trial court from considering Shook, the court of appeals unduly restricted the trial court's ability to protect the child's best interest.

When G.W. was three-and-a-half years old, Gray filed an original suit affecting the parent-child relationship requesting that he and Wood be appointed joint managing conservators and that Wood be given the primary right to establish G.W.'s residence.[1] Shook intervened on the basis that she "has had actual care, control, and possession of [G.W.] for more than 6 months ending no more than 90 days preceding

[381 S.W.3d 542]

the date of filing of [the] petition." *See* Tex. Fam.Code § 102.003(a)(9). She requested that she and Wood be appointed joint managing conservators and that she be named the joint managing conservator with the exclusive right to designate G.W.'s primary residence. She also asked that Gray be appointed possessory



conservator. Subsequently, Gray amended his petition to request that the trial court appoint him joint managing conservator with the exclusive right to establish G.W.'s residence. Gray did not specify who should be named the other joint managing conservator.

Shortly after G.W. was born, G.W. and her mother moved into Shook's home in Victoria, Texas. At the time of the custody hearing, when G.W. was almost five years old, G.W. still lived with Shook. Wood had moved out of Shook's home to live on her own two years earlier, and Gray had lived in Houston, New Jersey, Colorado, and Seattle between G.W.'s birth and the time of the custody hearing. The trial court appointed Shook as G.W.'s sole managing conservator and named Gray and Wood as G.W.'s possessory conservators.

The court of appeals reversed, holding that the trial court abused its discretion in naming Shook, a nonparent, as G.W.'s sole managing conservator because Shook failed to present any evidence that could overcome the presumption that a parent should be named as managing conservator. 329 S.W.3d at 198–99;Tex. Fam.Code § 153.131 (stating that a parent shall be appointed as a sole managing conservator or both parents shall be appointed as joint managing conservators "unless the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development"). Additionally, the court of appeals remanded the case for the trial court to reconsider the conservatorship and access rights between Gray and Wood only and explained:

[T]he trial court held in Shook's favor, making it unnecessary for that court to determine G.W.'s best interest as it related to the custodial or visitation rights that should exist between Gray and [Wood] only. Because of this, and because we have overturned the trial court's ruling designating Shook as sole managing conservator, we find it to be in the interest of justice not to simply render judgment in Gray's favor. Further, more than a year has passed since

the custodial hearing; circumstances may have changed during this time such that it would not be in G.W.'s best interest to appoint Gray as her sole managing conservator, and we have no ability to determine the present circumstances of any of the parties, nor do we have the luxury of sitting as a fact-finder. For the forgoing reasons, we remand this case to the trial court for custodial hearings to determine the rights as between Gray and [Wood] only.

329 S.W.3d at 199. Shook contends that the court of appeals should not have precluded the trial court from considering her role in G.W.'s life on remand. We agree.

By foreclosing the trial court from considering Shook on remand, the trial court may be unable to protect G.W.'s best interest. Tex. Fam.Code § 153.002 ("The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child."). As the court of appeals pointed out, it had "no ability to determine the present circumstances of any of the parties, nor d[id it] have the luxury of sitting as a fact-finder." *Id.* That statement illustrates the problem with remanding for custodial hearings between Gray and

[381 S.W.3d 543]

Wood only. The trial court must be able to consider the changed circumstances. G.W. is now nine years old and over four years have passed since the trial court issued its order. Even assuming Shook previously failed to present evidence capable of overcoming the parental presumption, it does not follow that she will necessarily be unable to overcome the parental presumption under the present circumstances.

Moreover, Shook pled and established general standing to file a suit for conservatorship and access, as someone who has had care, control, and possession of a child for the designated time. Tex. Fam.Code § 102.003



(authorizing suit by "a person, other than a foster parent, who has had actual care, control, and possession of the child for at least six months ending not more than 90 days preceding the date of the filing of the petition"). Shook's inability to overcome the parental presumption does not deprive her of standing to be considered for conservatorship or access. If Shook fails to overcome the presumption that a parent should be named managing conservator on remand, the trial court may still name Shook as a possessory conservator or grant her access if that would be in G.W.'s best interest.

Thus, we conclude that the court of appeals erred in preventing the trial court from considering Shook for conservatorship of or access to G.W. Accordingly, without hearing oral argument, we affirm the court of appeals' judgment remanding the case, but reverse to the extent the judgment limits the trial court's consideration of the role Shook should play in G.W.'s life, whether as conservator or a person with defined access rights. Tex.R.App. P. 59.1.

--------

Notes:

[1.] In his petition, Gray stated, "The best interest of [G.W.] will be served by the appointment of Lucy Wood as joint managing conservator with the exclusive right to designate the primary residence of the child, and [Gray] so requests." Gray further requested that "appropriate orders be made for access to the child and the allocation of the rights and duties of the conservators." Although Gray does not explicitly state the type of conservatorship he sought, we infer that he wished to be named a joint managing conservator.

